**AMERICAN AIRLINES EMPLOYEES FEDERAL CREDIT UNION,**
Appellant,

v.

**Tim A. MARTIN, Appellee.**

**No. 2–98–044–CV.**

Court of Appeals of Texas,
Fort Worth.

March 4, 1999.

Vial, Hamilton, Koch & Knox, L.L.P., Stephen L. Baskind, Karen K. Fitzgerald, and Tex Lezar, Dallas, for Appellant.

Lewis & Hutchinson, P.C., Kern A. Lewis, Fort Worth, for Appellee.

Panel B: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

## OPINION

TERRIE LIVINGSTON, Justice.

In 1990, Tim Martin, appellee, opened a savings account at American Airlines Employees Federal Credit Union ("Credit Union"). Four years later, the Credit Union adopted a deposit agreement shortening the statutorily prescribed one-year time period in which a customer could assert claims to 60 days.

On June 10, 1995, Molly Blair, Martin's girlfriend, fraudulently added herself as co-owner of Martin's savings account. Over the next six months, Blair transferred approximately $49,800 from Martin's account to her own account.

The Credit Union mailed Martin notices of these transactions, as well as quarterly statements showing all account activity for the period. Martin failed to notice the addition of Blair as co-owner of the account or any of the transfers until December 20, 1995, 63 days after the Credit Union mailed his last quarterly statement. We are asked to determine whether Martin's failure to report the withdrawals within 60 days precludes his recovery under Texas Business and Commerce Code (the "UCC") section 4.406 as modified by the parties' 1994 deposit agreement. The trial court held it did not, and we affirm its judgment.

## BACKGROUND

Martin opened a savings account at the Credit Union in July of 1990. Martin was the sole owner of the account and the only authorized signatory. When Martin opened the account, the Credit Union did not provide him with a deposit agreement or other information regarding the account. However, Martin agreed to be bound by the then-existing deposit agreement. He also agreed to any changes, modifications, amendments, or future deposit agreements adopted by the Credit Union.

In May 1994, using individual quarterly statements and the membership newsletter, the Credit Union notified members that it had adopted a new deposit agreement. The Credit Union made copies of the agreement available in its various branches; however, it did not mail its members a copy of the new deposit agreement unless requested.

Sometime prior to June 1995, Martin began dating and living with Molly Blair. Blair was also a member of the Credit Union. On June 2, 1995, Blair executed a "Membership Account Change Card" for her account, giving Martin joint ownership. On June 10, the Credit Union received a reciprocal request adding Blair as joint owner of Martin's account. Before making either change, the Credit Union verified the personal and account information contained in the requests, compared signatures to those on the member's original signature card, and changed the ownership status of both accounts.

Almost immediately, Blair began withdrawing funds from Martin's account. Just two days after the Credit Union received the request to change Martin's account status, Blair transferred $5,000 to her account. Between June 12 and November 16, 1995, Blair completed fourteen transfers totaling $49,800.

Blair only made two of these transfers in person; the remaining transfers were made over the telephone. Blair simply telephoned the Credit Union, identified herself with some personal information, and transferred money from Martin's account directly to her account. As part of each of these transactions, the Credit Union completed a "journal voucher," detail-

ing the transaction. The Credit Union mailed a copy of each voucher to Martin.

In addition to the vouchers, the Credit Union also mailed two quarterly statements covering the June through September time periods. These quarterly statements showed 10 of the 14 transfers, as well as the addition of Blair as co-owner of Martin's account. Martin testified that he never saw the statements or vouchers, although the evidence is conflicting as to why.

On December 20, 1995, while making a deposit, Martin detected the discrepancy in the account's balance and immediately informed the Credit Union of the variance. Later he filed suit, seeking recovery of the $49,800.

The parties tried the case to the court. Martin's primary complaint at trial was that the Credit Union had breached the deposit agreement and former UCC sections 3.401, 3.404(a), 4.401(a)[1] by transferring funds to Blair's account. The Credit Union denied liability. Based on former section 4.406, the Credit Union contended that by sending the journal vouchers and quarterly statements to Martin, coupled with his failure to examine these documents and report the transfers, Martin's recovery is barred.

The Credit Union advances a three-fold defense to Martin's recovery based on former section 4.406.[2] First, it argues that Martin is barred from recovery because he breached his duty to discover and report Blair's unauthorized withdrawals within a statutorily-prescribed absolute notice period, as modified by the deposit agreement. *See* former section 4.406(d) (currently codified at section 4.406(f)). Second, the Credit Union contends that Martin's failure to exercise reasonable care and promptness in examining and discovering unauthorized activity bars his recovery. *See* former section 4.406(b)(1) (currently codified at section 4.406(f)). Third, the Credit Union asserts that former section 4.406(b)(2) places a 14-day limitation on Martin's recovery, separate and apart from the 60-day notice period. *See* former section 4.406(b)(2) (currently codified at section 4.406(d)(2)).

### Absolute Notice Period—Former Section 4.406(d)

The trial court entered findings of facts and conclusions of law. It found (1) there was no unauthorized signature used to obtain funds from Martin's account, (2) Blair gave no written instructions for any transfers from Martin's account, (3) the 60-day notice provision in the 1994 deposit agreement was not conspicuous, (4) the 60-day

1. *See* Act of May 24, 1967, 60 TH Leg., R.S., ch. 785, § 1, 1967 Tex. Gen. Laws 2343, 2423 (amended 1995) (current version at Tex Bus. & Com.Code Ann. § 3.401 (Vernon Supp.1999)); Act of May 24, 1967, 60 th Leg., R.S., ch. 785, § 1, 1967 Tex. Gen. Laws 2343, 2423–24 (amended 1995) (current version at Tex Bus. & Com.Code Ann. § 3.404 (Vernon Supp.1999)); Act of May 24, 1967, 60 th Leg., R.S., ch. 785, § 1, 1967 Tex. Gen. Laws 2343, 2457 (amended 1995) (current version at Tex Bus. & Com Code Ann. § 4.401 (Vernon Supp.1999)).

Significant revisions were made to the Business and Commerce Code in 1995. Those revisions were not effective until January 1, 1996. *See* Act of May 28, 1995, 74 th Leg., R.S., ch 921, § 10, 1995 Tex. Gen. Laws 4582, 4643.

Section 9 of the 1995 amendatory act provides:

(a) This Act does not affect an action or proceeding that is commenced or a right that accrues before the effective date.

(b) An action or proceeding that is commenced or a right that accrues before the effective date of this Act is governed by the law in effect on the date the action or proceeding was commenced or the right accrued, and that law is continued in effect for that purpose.

Tex Bus. & Com Code Ann. § 3.101 historical note (Vernon Supp.1999) [Act of May 28, 1995, 74th Leg., R.S., ch. 921, § 9, 1995 Tex. Gen. Laws 4582, 4643].

Because the underlying events occurred in 1995, we will apply the then-existing UCC provisions.

2. *See* Act of May 24, 1967, 60 th Leg., R.S., ch. 785, § 1, 1967 Tex. Gen. Laws 2343, 2458–59 (amended 1995) (current version at Tex Bus. & Com.Code Ann. § 4.406 (Vernon Supp.1999)).

notice provision was vague, and (5) the 60-day notice provision was ambiguous.[3] In addition, the court concluded the 1994 deposit agreement provisions modifying the one-year statutory notice provision were vague, ambiguous, and inconspicuous and that Martin did not knowingly waive his statutory one-year notice period.

The Credit Union challenges the legal sufficiency of the court's finding that no unauthorized signature was used to obtain the funds and that Blair made no written instructions to transfer funds. The Credit Union also asserts that Martin's failure to discover and report unauthorized signatures within an "absolute notice period" bars his recovery.

■ Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *See Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex.1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994). However, conclusions of law may not be challenged for factual sufficiency, but may be reviewed to determine their correctness based upon the facts. *See Forbis v. Trinity Universal Ins. Co.*, 833 S.W.2d 316, 319 (Tex.App.— Fort Worth 1992, writ dism'd).

■ The Credit Union claims that Martin was required to report the transfers within a prescribed absolute notice period, and that that period was 60 days. Former section 4.406(d) provided:

> Without regard to care or lack of care of either the customer or the bank a customer who does not **within one year** from the time the statement and items are made available to the customer (Subsection (a)) discover and report his unauthorized signature or any alteration on the face or back of the item ... is precluded from asserting against the bank such unauthorized signature ... or such alteration. [emphasis added.][4]

Former section 4.406(d), therefore, provided an absolute one-year period in which a customer had to assert that an item contained an unauthorized signature. However, the UCC, with few restrictions, allows parties to modify its provisions. *See* former section 4.103(a).[5]

The Credit Union asserts that the parties modified the UCC's terms and shortened the time period in which a customer was required to report unauthorized signatures. The Credit Union claims the 1994 deposit agreement reduced the limitation period from one year to 60 days.[6] The amended deposit agreement provided that all objections were "waived unless made in writing to us, and received on or before the sixtieth (60th) day following the date the statement is mailed, subject to applicable law." Based on the modified 60-day period, the Credit Union argues that Martin's recovery is limited to $5,300.[7]

---

**3.** Whether an "unauthorized signature" is used to obtain funds and whether a contract is vague, ambiguous, or inconspicious are questions of law. *See, e.g., Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 282 (Tex.1996); *Cate v. Dover Corp.*, 790 S.W.2d 559, 560 (Tex.1990). The trial court's findings provide that "[a]ny finding of fact which should be designated as a conclusion of law is hereby redesignated as a conclusion of law." We will redesignate these findings as conclusions of law and address them as such.

**4.** Act of May 24, 1967, 60th Leg., R.S., ch. 785, § 1, 1967 Tex. Gen. Laws 2343, 2458–59 (amended 1995).

**5.** Act of May 24, 1967, 60th Leg., R.S., ch. 785, § 1, 1967 Tex. Gen. Laws 2343, 2443 (amended 1995) (current version at TEX. BUS. & COM. CODE ANN. § 4.103 (Vernon Supp. 1999)).

**6.** The parties do not address whether a period, other than the statutory one-year period, controlled prior to the 1994 deposit agreement.

**7.** At the time Martin reported the variance, the following transactions had not appeared on any quarterly statement: (1) $1,000 transferred October 4, (2) $2,500 transferred Octo-

To avail itself of former section 4.406(d)'s defense, the Credit Union was required to either send the account holder—Martin—a statement accompanied with items paid in good faith, hold the statement and items at his request, or make the statement and items otherwise reasonably available. *See* former section 4.406(a). Once any of these triggering events occurred, the account holder—Martin—had to report any unauthorized signatures or alterations within a prescribed period or lose the right to complain of such. Central to this discussion is whether the transfers were obtained with an unauthorized signature. *See* former section 4.406(d); *see also La Sara Grain Co. v. First National Bank of Mercedes*, 673 S.W.2d 558, 564 (Tex.1984) (holding that former section 4.406(d) provided no defense when funds were obtained without the use of an unauthorized signature). The Credit Union contends that the journal vouchers generated with each withdrawal contain "unauthorized signatures" for the purposes of section 4.406. We disagree.

The supreme court defines an unauthorized signature to include: a forgery or other signature made without actual, implied, or apparent authority. *See La Sara Grain Co.*, 673 S.W.2d at 562; *see also* TEX. PENAL CODE ANN. § 32.21(a)(1)(A)(i) (Vernon 1994) (defining forgery as execution of any writing that purports to be the act of another who did not authorize the act).

The Credit Union contends that the tellers' initials on the journal vouchers were the unauthorized signatures of the Credit Union's *tellers* as agents of the account holder. The Credit Union argues that the tellers' signatures were unauthorized be-

cause they were made at Blair's request, and Martin had not authorized the transfer of funds.

The Credit Union's focus is misplaced. Its argument focuses on the subsequent clerical actions of its employees rather than Martin's or Blair's actions. Blair made 12 of the transfers orally by telephone with no accompanying written request that funds be transferred. While the Credit Union might not have actually transferred the funds until the vouchers were processed, this internal procedure simply created a record of the completed transaction. This procedure did not transform the oral request into a signature; it created a receipt. *See* TEX. BUS. & COM. CODE ANN. § 1.201(39) (Vernon 1994) (defining "signed" as any symbol executed or adopted by a party with present intention to authenticate a writing).

■ Admittedly, initials are sufficient to satisfy authentication. *See id.* cmt. 39. However, the question is whether the "symbol was executed or adopted by a party with present intention to authenticate the writing." *Id.* We believe the executing or adopting party is the person requesting the transfer of funds, not the Credit Union's employees. Thus, the question is whether Blair intended for the tellers' initials to authenticate the writing.[8] Here, there is no evidence that Blair knew of the tellers' initials on the journal vouchers. Therefore, Blair did not adopt the "symbol" (the tellers' initials) "with present intention to authenticate [the] writing." *Id.* Furthermore, the employee has no reason to authenticate a writing. Rather, the employee would be required to rely on an authenticated writing before paying out funds.

---

ber 12, (3) $1,300 transferred October 23, and (4) $500 transferred November 16.

8. Based on the comment to UCC § 1.201(39) the Credit Union also contends that Martin's printed name on the vouchers satisfies the "signed" requirement. However, as with the tellers' initials, this symbol was generated by the Credit Union; thus, it requires that either

Blair or Martin adopt it with a present intention to authenticate the writing. There is no evidence that either Blair or Martin adopted that "symbol" (Martin's printed name). Therefore, Martin's printed name on the journal vouchers does not satisfy the signed requirement.

Further, in *La Sara Grain Co.*, the Texas Supreme Court stated that former section 4.406(d) provided no defense regarding an oral transfer of funds because no unauthorized signature was used to obtain the withdrawal. *See id.* at 564. This was based on the court's conclusion that the contract between the bank and La Sara "did not authorize the bank to disburse funds ... at the oral request of Jones" (the defrauding party). *Id.* Thus, a "signature" under 4.406 may depend on the parties' deposit agreement. Nonetheless, the Credit Union does not offer any evidence that the parties agreed to allow oral transfers. In fact, the 1994 deposit agreement states, "You authorize us to recognize any of the signatures set forth on the [Membership] Application in the payment of funds or the transaction of any business for your accounts." While the Credit Union's transfers of funds were not authorized by Martin, they also were not evidenced by signatures, as that term is defined in the UCC or in the 1994 deposit agreement.

Because the tellers' initials were not signatures under former section 4.406(d), and because Blair did not forge Martin's signature, sign her name, or execute or adopt *any* symbol or mark to authenticate the writing, we hold that no unauthorized signature was used to transfer the funds. Thus, the trial court correctly concluded that the transfers did not involve an unauthorized signature.

On two other occasions, July 12, and July 28, Blair made transfers in person. When initiating these transfers, Blair was asked to show identification, and after a teller confirmed her identity, funds were transferred to her account. As with the telephone transfers, journal vouchers were generated and signed by the teller. We find nothing in the record, and the Credit Union points to no evidence, showing that Blair forged Martin's signature, signed her

name, or executed or adopted *any* symbol or mark to authenticate the writing to effectuate these transfers. Thus, although made in person, these transfers were otherwise identical to the telephone transfers. We hold the trial court's conclusion that the "in-person" transfers were not obtained with an unauthorized signature is likewise correct. Because no unauthorized signature was used to effectuate either the telephone or in-person transfers, former section 4.406(d) is not a defense available to the Credit Union.

The Credit Union argues that federal case law and legal commentators support its position that former section 4.406's defense is applicable. In *Minskoff v. American Express Travel Related Servs. Co.*, 98 F.3d 703 (2d Cir.1996), the court held a corporation and its president liable for a portion of debt created by the unauthorized use of a fraudulently obtained credit card. *See id.* at 710. There, the court held the wrongdoer's use of the credit card—coupled with the cardholder's failure to examine his credit card statements and subsequent payments by the corporation—created an appearance of authority that the wrongdoer was authorized to use the credit card. *See id.* at 709. In its discussion of whether Minskoff's actions created apparent authority in the wrongdoer to use the credit card, the court stated that Minskoff had a duty to examine his credit card statements and analogized this duty to the duty to examine bank statements found in section 4.406.[9] Because *Minskoff* was decided on the issue of apparent authority, and did not address the issue of "unauthorized signature," we do not find it applicable.

Next, the Credit Union urges that section 4.406's defense is available because, regardless of whether the only hard copy evidencing a transaction is produced by the credit union on its statement sent to the customer, it is still an "item." *See* 6

9. Although the court was analogizing the duty to examine a credit card statement to the duty to examine a bank statement created under

New York's Uniform Commercial Code, that duty is substantially similar to that created under the Texas Uniform Commercial Code.

WILLIAM D. HAWKLAND, ET AL., UNIFORM COMMERCIAL CODE SERIES § 4.406:02, at 446. This argument addresses whether the transactions are "items" and not whether an unauthorized signature was used to obtain funds; therefore, it is irrelevant to the unauthorized signature issue.

■ Although not raised as a separate point, the Credit Union also contends that Blair's unauthorized signature on the "Membership Account Change Card," that changed Martin's account to co-ownership status, provided an unauthorized signature upon which it may assert a section 4.406(d) defense.

While it is clear that the account card contained an unauthorized signature, an unauthorized signature alone is insufficient to implicate section 4.406(d)'s protection. A second requirement is that the unauthorized signature be on an "item." *See* former section 4.406(d). Former section 4.104(a)(7) defined an item as, "any instrument for the payment of money even though it is not negotiable but does not include money." [10] An instrument is a signed writing that is made payable to "order" or "bearer" and contains "an unconditional promise to pay a sum certain on demand or at a specified time." [11] The account card contained neither; therefore, it was not an "item." Accordingly, Martin's forged signature on the Membership Account Change Card is an insufficient basis for the Credit Union's 4.406 defense. We overrule the Credit Union's first and second points.

## REASONABLE CARE AND PROMPT EXAMINATION

■ In its third and fourth points, the Credit Union asserts that former section 4.406(b)(1) also bars Martin's claim for failure to exercise reasonable care in examining his statements and promptly reporting the unauthorized activity. Here, the Credit Union challenges the following findings of fact:

● the signature on the Membership Account Change Card is so dissimilar to Martin's signature card that any person exercising reasonable care during a comparison would recognize the difference;

● an adequately trained employee exercising reasonable care would have recognized the account change card was forged;

● the Credit Union did not adequately train either its temporary or permanent employees in signature comparison;

● the Credit Union failed to exercise reasonable care or follow commercial standards in its acceptance of the account change card;

● the Credit Union was negligent in processing the account change card;

● the Credit Union breached the deposit contract;

● all information required on the account change card is reasonably available to the public;

● no unauthorized signature was used to obtain funds from Martin's account;

● Blair gave no written instructions for any transfers from Martin's account;

● the Credit Union's conduct was a breach of the deposit agreement;

● the Credit Union's conduct was a breach of its implied promise to disburse funds only on Martin's authority;

● it is not difficult for an unauthorized person to add themselves to an account under the Credit Union's existing policies and procedures;

● the 60–day notice provision in the deposit agreement was not conspicuous;

● the 60–day notice provision was vague;

---

10. Act of May 24, 1967, 60th Leg., R.S., ch. 785, § 1, 1967 Tex. Gen. Laws 2343, 2443–45 (amended 1995) (current version at TEX. BUS. & COM.CODE ANN. § 4.104 (Vernon Supp.1999)).

11. Act of May 24, 1967, 60th Leg., R.S., ch. 785, § 1, 1967 Tex Gen Laws 2343, 2408–10 (amended 1995) (current version at TEX. BUS. & COM.CODE ANN. § 3.104 (Vernon Supp.1999)).

- the 60–day notice provision was ambiguous;
- Martin never agreed to the 60–day notice provision; and
- Martin did not intentionally relinquish his right to a one-year notice provision.

In addition, the Credit Union challenges the following conclusions of law:

- the deposit agreement provisions modifying Martin's statutory notice provision were vague, ambiguous, and inconspicuous;
- Martin did not knowingly waive his statutory one-year notice period;
- the Credit Union breached the contract with Martin;
- the Credit Union could not require Martin to comply with additional terms of the contract; and
- the Credit Union breached its implied promise to recognize Martin's signature on documents or instruments.

To clarify the distinction among the Credit Union's points, in points one and two, the Credit Union contended Martin's claim was barred under former section 4.406(d)—failing to notify the Credit Union within an absolute notice period. In points three and four, the Credit Union contends that Martin failed to exercise reasonable care in examining his statements and to promptly notify the Credit Union within a reasonable time as required by 4.406(b).

Former section 4.406(b)(1) provided:

> [i]f the bank establishes that the customer has failed with respect to an item to comply with the duties imposed on the customer by Subsection (a) [prompt examination and reporting of unauthorized signatures] the customer is precluded from asserting against the bank ... [the] unauthorized signature or alteration on the item if the bank also

establishes that it suffered a loss by reason of such failure.... [12]

Thus, former section 4.406(b) charged a depositor with a duty of reasonable care to examine and promptly report the discovery of any unauthorized signature or any alteration. *See La Sara Grain Co.,* 673 S.W.2d at 561; *McDowell v. Dallas Teachers Credit Union,* 772 S.W.2d 183, 188 (Tex.App.—Dallas 1989, no writ). If the depositor failed to comply with this duty and the bank suffered a loss, then the bank was protected from the loss. *See La Sara Grain Co.,* 673 S.W.2d at 561–62.

The Credit Union contends that Martin breached his duty; therefore, section 4.406(b)(1) protects it from loss. Again, we disagree. Martin's duty was to discover "unauthorized signatures" and as previously discussed, no unauthorized signature was used to effectuate either the telephone or in-person transfers. Therefore, the Credit Union suffered no loss as a result of an unauthorized signature. Consequently, the section 4.406(b)(1) defense is not available to the Credit Union. We overrule the Credit Union's third and fourth points.

## REPEATER RULE

In point five, the Credit Union challenges the same findings of fact and conclusions of law as in points three and four but attacks them based on former section 4.406(b)(2). Former section 4.406(b)(2) [13] precluded a customer from asserting a claim against a bank based on:

> an unauthorized signature ... by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding fourteen calender days and before the bank receives notification

---

12. Act of May 24, 1967, 60th Leg., R.S., ch. 785, § 1, 1967 Tex. Gen. Laws 2343, 2458–59 (amended 1995)).

13. Section 4.406(b)(2) is often referred to as the "repeater rule" because its provisions only become operative when a customer fails to discover the repeated actions of a wrongdoer.

from the customer of any such unauthorized signature.... [14]

The Credit Union contends that because Blair was the "same wrongdoer" on all of the underlying transactions, this defense is implicated and Martin was required to report the transfers within 14 days after his quarterly statements were made available. Because Martin failed to report the transfers within 14 days, the Credit Union contends that he is barred from asserting his claim. We disagree.

The Credit Union's repeater rule defense suffers the same defect as its absolute notice period defense. Like the absolute notice period defense, former section 4.406(b)(2) required that an unauthorized signature be used in obtaining the funds. Thus, former section 4.406's repeater rule defense is not available to the Credit Union. We overrule the Credit Union's fifth point.

In its sixth point, the Credit Union asserts that Martin failed to establish that the Credit Union did not exercise ordinary care in processing the transfers. The resolution of this point also affects whether former section 4.406 was an available defense to the Credit Union. Former sections 4.406(b)(1) and (b)(2) provided defenses to a bank's liability, but former section 4.406(c) acted as a counter-measure to either defense by requiring the bank to use ordinary care in paying items. Thus, if Martin established that the Credit Union did not exercise ordinary care, the Credit Union loses those defenses. Because the Credit Union's sixth point is predicated on the application of either former section 4.406(b)(1) or (b)(2)'s defense, and the Credit Union is not entitled to either, the Credit Union's sixth point is overruled.

## CONTRACTUAL CLAIM OR NEGLIGENCE

In point seven, the Credit Union argues that even if it is not afforded a defense

under section 4.406, Martin has failed to establish a contractual breach or a negligence-based cause of action sufficient to recover. Said another way, the Credit Union challenges the trial court's findings of fact and conclusions of law that establish the Credit Union breached the deposit agreement and its implied promise to disburse funds only in accordance with Martin's instructions.

The Credit Union is again challenging the identical findings of fact and conclusions of law as those challenged in its former section 4.406(b)(1)—reasonable care and prompt examination—defense.

The Credit Union's argument poses two possible interpretations. First, it may be interpreted as a challenge to both the legal and factual sufficiency of the evidence to support the court's finding that the Credit Union breached the deposit agreement. Second, it may also be interpreted as a challenge to the court's findings and conclusions that the absolute 60–day provision is not a contractual limitation on Martin's recovery, even if the Credit Union breached the deposit agreement. Although its argument suggests the latter, we will address both.

■ We begin by addressing whether the evidence both legally and factually supports the court's finding that the Credit Union breached the deposit agreement. Essential to the breach of contract issue are the court's findings that (i) Martin, as the sole owner of the account, did not authorize any of the transfers made by Blair, (ii) the Credit Union's conduct was a breach of its deposit agreement, and (iii) the Credit Union's conduct was a breach of its implied promise to disburse funds only upon Martin's authorization.

Findings of fact have the same force and dignity as a jury's answers to jury questions. *See Anderson*, 806 S.W.2d at 794.

14. Act of May 24, 1967, 60th Leg., R.S., ch. 785, § 1, 1967 Tex. Gen. Laws 2343, 2458–59 (amended 1995).

Unchallenged findings of fact are binding unless the contrary is established as a matter of law or there is no evidence to support the finding. *See McGalliard v. Kuhlmann,* 722 S.W.2d 694, 696 (Tex. 1986). Challenged findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *See Ortiz,* 917 S.W.2d at 772. However, conclusions of law may only be reviewed to determine their correctness based upon the facts. *See Forbis,* 833 S.W.2d at 319.

▮▮ When a customer deposits funds in a bank, the bank impliedly agrees to disburse those funds in accordance with the customer's instructions. *See La Sara Grain Co.,* 673 S.W.2d at 564 (citing former sections 3.404(a), 4.401(a)). The Credit Union did not challenge the court's finding of fact number 32, where the trial court found that Martin, the sole·owner of the account, did not authorize any of Blair's transfers. This finding is supported by Martin's testimony that he never authorized Blair to be added to the account and he never authorized the transfers. Furthermore, the contrary of that fact is not established as a matter of law. Consequently, this finding of fact is binding on the Credit Union.

This finding supports the trial court's conclusions of law 6 and 9 that the Credit Union breached its contract by transferring the $49,800 and its implied promise to recognize signatures on documents and instruments concerning Martin's account.

▮▮ The second possible interpretation is that the Credit Union is challenging the court's findings and conclusions that the contractual 60–day absolute notice provision does not limit Martin's recovery. In findings of fact 50 and 51, the court found that Martin never agreed to the 60–day notice provision and that he did not intentionally relinquish his known right to a statutory one-year notice provision. In conclusion of law number 5, the court held that Martin did not intentionally relinquish his known right of a one-year notice provision.

▮▮ Waiver of a statutory right requires a knowing, voluntary, intentional relinquishment of that right. *See Housing Auth. of City of Corpus Christi v. Massey,* 878 S.W.2d 624, 627 (Tex.App.—Corpus Christi 1994, no writ); *Estes v. Wilson,* 682 S.W.2d 711, 714 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.). Moreover, a waiver provision must state specifically and separately the right or rights surrendered. *See Shumway v. Horizon Credit Corp.,* 801 S.W.2d 890, 893 (Tex.1991). Finally, waiver must be clearly proven. *See Massey,* 878 S.W.2d at 627; *Estes,* 682 S.W.2d at 714.

The Credit Union argues that it complied with Federal Regulations relating to the appropriate method of notifying Martin of the 1994 deposit agreement. *See* 12 C.F.R. § 707.4(c) & app. C. (1997) Likewise, it contends that the deposit agreement complies with the form established in those regulations. *See* 12 C.F.R. § 707.3(a)(2) & app. C (stating that Credit Unions are not required to use a particular type size or typeface, nor is any term required to be more conspicuous than any other). However, we do not believe that these arguments fully address the court's findings and conclusions.

Beverly Boldt, an expert for the Credit Union acknowledged that the provision does not mention former section 4.406, nor does it state that it modifies or waives any statutory provisions. In addition, Martin testified that he never received a copy of the 1994 deposit agreement that modified the statutory one-year notice period and that he never knowingly intended to modify or waive the statutory one-year notice period.

The court's findings and conclusions demonstrate that the court was also addressing the provision's failure to clearly and specifically state the rights it was attempting to modify. These findings and

conclusions are directed to the content of the provision and not the Credit Union's method of notice or the agreement's form. Thus, whether the Credit Union complied with regulations relating to form and notice does not preclude the court's findings and conclusions.

Based on the evidence, we find the evidence legally and factually sufficient to support the trial court's findings and conclusions that Martin did not agree to the 60–day notice provision; and therefore, he did not waive his statutory one-year notice provision. We overrule that portion of point seven dealing with breach of contract.

■ In addition to breach of contract, Martin pleaded that the Credit Union breached its duty to exercise ordinary care when it allowed Blair to fraudulently add herself to his account. We find the evidence sufficient to support a claim based on negligence.

Among its findings of fact, the trial court determined that the Credit Union customarily used temporary employees in signature verification, it did not adequately train its temporary or regular employees in its signature comparison, Martin's signature on the account change card is so dissimilar that anyone exercising reasonable care would question its authenticity, and the Credit Union failed to exercise ordinary care in handling and accepting the account change card. In finding of fact number 12, the trial court determined the Credit Union was negligent in accepting the signature on the account change card.[15] The court's findings that the Credit Union failed to adequately train its employees in signature comparison, and that it failed to exercise reasonable care in handling the account change card support the conclusion that the Credit Union was negligent in allowing Blair to add herself as co-owner.

Martin offered expert testimony that it was the accepted reasonable commercial standard in the banking industry to verify signatures on account change cards, and that experienced, trained personnel are used in signature verification. The witness further testified that even a cursory review of the signature, on the account change card, would cause a reasonably trained person to question its authenticity.

The Credit Union, on the other hand, provided expert testimony that several large national credit unions do not verify signatures at all when the ownership status of an account is changed. It contended that by simply undertaking any examination of the signatures it exceeded the reasonable commercial industry standards. Therefore, it contends to establish negligence Martin had to establish that the industry standards are unreasonable. *See McDowell,* 772 S.W.2d at 189.

The Credit Union argues that testimony as to the standards applied by large commercial banks is simply not applicable to credit unions. Thus, whether banks verify signatures on account change cards is immaterial. *See, e.g., Qassemzadeh v. IBM Poughkeepsie Employees Fed. Credit Union,* 167 A.D.2d 378, 561 N.Y.S.2d 795 (1990).

We begin by noting that either a bank's or credit union's procedure must reasonably relate to its duty to protect a customer's account, and any procedure that fails to do so can not be considered commercially reasonable. *See McDowell,* 772 S.W.2d at 191. Furthermore, we do not agree that the Credit Union established that it was general industry standard to accept account change cards without signature verification, or that its verification procedure with untrained temporary employees was commercially reasonable. *Cf. McDowell,* 772 S.W.2d at 185 n. 1 (banks and credit unions are often held to the same standards). The evidence supports the trial court's conclusion that the Credit Union was negligent in accepting the account

---

15. This is a question of law and we will treat it as such.

change card. Consequently, we overrule the remainder of point seven.

## RE–OPENING THE RECORD

In its final point, the Credit Union argues that based on evidence presented two weeks after trial, the court should have re-opened the record. The Credit Union presented evidence establishing that Blair, immediately prior to these transfers, had also forged Martin's checks from a different institution's account. In its motion, the Credit Union contended that the additional evidence "strongly reflects on and supports [its] defenses based on Martin's negligence."

Whether to re-open a case for the purpose of admitting additional evidence is within the sound discretion of the trial judge, and his action refusing to permit a party to re-open should not be disturbed by an appellate court unless it clearly appears that there was an abuse of discretion. *See Word of Faith World Outreach Ctr. Church, Inc. v. Oechsner*, 669 S.W.2d 364, 366 (Tex.App.—Dallas 1984, no writ).

In deciding whether to re-open a case, a court is to consider four factors: (1) whether the proffered evidence is decisive; (2) whether the reception of such evidence will cause any undue delay; (3) whether the court's refusal to reopen will do an injustice; and (4) whether a party exercised due diligence in obtaining the evidence. *See id.* at 366–67. Thus, we must consider whether the Credit Union's evidence in support of its motion to re-open was in fact material, relevant, and decisive, and if so, whether the trial court abused its discretion in denying the motion to re-open.

Because we found that the Credit Union was not entitled to assert any defenses under section 4.406, this additional information is immaterial. Further, evidence establishing that Blair had forged other checks, while probative of whether Martin had notice, is not probative of whether the Credit Union breached its contract or was negligent in accepting the account change card. Thus, it is also immaterial to these issues. Because it is immaterial, we hold the trial court did not abuse its discretion in refusing to re-open the record.

## CONCLUSION

Because we find the trial court's conclusions of law, based on the underlying facts, are correct, we hold that no "unauthorized signature" was used to obtain funds. Therefore, the Credit Union is precluded from asserting any defense under former section 4.406 of the UCC. Furthermore, we find sufficient facts support the trial court's conclusion that the Credit Union breached its deposit agreement and its implied promise to disburse funds solely in accordance with Martin's instruction. Finally, because we hold that the Credit Union is unable to invoke section 4.406(b)(1) and (b)(2)'s protection, additional evidence regarding Martin's negligence is immaterial; therefore, the trial court did not abuse its discretion by refusing to re-open the record. The trial court's judgment is affirmed.