COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-297-CV

ROBERT KIRK, INDIVIDUALLY AND      APPELLANTS

D/B/A US ASIAN CAPITAL ADVISORS, LLC, 

EUGENE M. KENNEDY, P.A., 

STEWART & ASSOCIATES, CPA’S, AND

KIMBERLY DECAMP 

V.

PRECIS, INC. APPELLEE

------------

FROM THE 236TH DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

Robert Kirk, individually and d/b/a U.S. Asian Capital Advisors, LLC,  Eugene M. Kennedy, P.A., Stewart & Associates, CPA’s, P.A., and Kimberly DeCamp, appeal on three issues.  Appellants seek reversal of the trial court’s judgment notwithstanding the verdict (“JNOV”) and its take-nothing order on the jury award of approximately $1.1 million.  Because we affirm the JNOV on Appellants’ negligence and negligent undertaking claims, we do not reach  Appellants’ first issue concerning damages for economic loss or Precis Inc.’s single cross-issue on mitigation of damages.

BACKGROUND

In February 2000, Appellee made an initial public offering (“IPO”) of common stock.  Barron Chase Securities, an investment banking firm, was the IPO’s managing underwriter,
(footnote: 2) and Kirk was Barron Chase’s chief executive officer at the time.  To compensate Barron Chase, Appellee issued 100,000 warrants
(footnote: 3) to Barron Chase, documented in the “Underwriter’s Warrant Agreement.”  Appellee also issued 200,000 stock options
(footnote: 4) to Barron Chase as payment for its work on a merger that closed around the same time as the IPO’s closing.

Kirk received the stock options and some of the warrants from Barron Chase; the other Appellants received their interests through him.
(footnote: 5)  The options had an exercise price of $9.37/share and an expiration date of June 30, 2003; the warrants had an exercise price of $9.00/share and an expiration date of February 8, 2005.  Neither had realizable value unless and until the market price rose above the exercise price.
(footnote: 6)
 The options and warrants were documented in written agreements under which Appellants had the contractual right to exercise the options and warrants without any additional assistance from Appellee.  Under these agreements, Appellants would receive shares of common stock, not cash.

Around March 15, 2002, Appellee’s outside securities counsel, Michael Dunn, discussed with Kennedy and Kirk an alternative method not included in the governing agreements for exercising their options and warrants for cash instead of stock.  This method involved the sale of stock to a third party through a broker before either Appellants or the broker owned or had possession of the shares; the strike price would be delivered to Appellee and the balance returned to the broker.  Because neither Appellants nor the broker would have the shares before the sale, they sought a “verification letter” from Appellee to confirm the existence and validity of the options and warrants and a commitment to timely deliver the shares.  Kennedy described this type of transaction as “cashless exercise with brokers at risk.”  Dunn referred Appellants to David May, Appellee’s general counsel.

Between February and early April 2002, Appellants opened accounts with Burt Arnold’s brokerage firm.  In April 2002, they sought to exercise their options and warrants under the alternative method because they wanted cash instead of stock.  Arnold, Kirk, and Kennedy pursued the verification letter from May as the stock price rose.  May testified that he had issued verification letters before, but that Arnold wanted something different.

Arnold testified that he would not write the letter himself for compliance reasons.  On April 30, 2002, Arnold sent May a fax of a document that “goes over the different things that our firm needs to proceed.”  The final letter was not issued until July 18, 2002, at which point the stock price was below the exercise price for both options and warrants.  It is undisputed that Appellants never gave orders to Arnold, their broker, to exercise the options and warrants as provided by the governing contracts.  Appellee’s stock peaked at $16.95 per share on April 29, 2002.

Around November 2002, Appellants complained that May’s delay in issuing the letter prevented them from exercising their options and warrants and sent a demand letter to Appellee, seeking their lost profits.  Appellants filed suit on August 29, 2003, seeking as damages the difference between the stock’s market value on May 7, 2002, and the strike price of the options and warrants. In addition to their negligence claims, Appellants also brought claims for breach of contract, resolved in Appellee’s favor by summary judgment, and fraud, which the jury did not find.  The jury found for Appellants on the negligent undertaking and negligence claims and awarded Appellants approximately $1.1 million in damages.  The court then granted Appellee’s motion for a JNOV on the negligence and negligent undertaking claims, and ordered that Appellants take nothing.

JUDGMENT NOTWITHSTANDING THE VERDICT

Appellants claim that the trial court erred by rendering a JNOV over the jury’s affirmative findings on general negligence and negligent undertaking and that they are entitled to recover damages under these theories for their economic loss.

Standard Of Review

A trial court may disregard a jury verdict and render a JNOV if no evidence supports the jury findings on issues necessary to liability or if a directed verdict would have been proper.  
See
 
Tex. R. Civ. P
. 301; 
Tiller v. McLure
, 121 S.W.3d 709, 713 (Tex. 2003); 
Fort Bend County Drainage Dist. v. Sbrusch
, 818 S.W.2d 392, 394 (Tex. 1991).  A directed verdict is proper only under limited circumstances: (1) when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent; or (2) when the evidence is insufficient to raise a material fact issue.  
Prudential Ins. Co. v. Fin. Review Servs., Inc.
, 29 S.W.3d 74, 77 (Tex. 2000); 
Ray v. McFarland
, 97 S.W.3d 728, 730 (Tex. App.—Fort Worth 2003, no pet.).   To determine whether the trial court erred by rendering a JNOV, we view the evidence in the light most favorable to the verdict under the well-settled standards that govern legal sufficiency review.  
See Wal-Mart Stores, Inc. v. Miller
, 102 S.W.3d 706, 709 (Tex. 2003).  In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, crediting evidence favorable to the jury findings if reasonable jurors could and disregarding evidence contrary to the findings unless reasonable jurors could not.  
See City of Keller v. Wilson
, 168 S.W.3d 802, 807, 827 (Tex. 2005).  Where, as here, the trial court gives no basis for its JNOV and the motion presented multiple grounds, Appellants have the burden of showing that the JNOV cannot be sustained on any of the stated grounds.  
See Sbrusch
, 818 S.W.2d at 394.
 

General Negligence 

In their third issue, Appellants argue that Appellee owed them a duty to use reasonable care in handling the exercise of options and warrants, including issuance of the verification letter, and that the evidence shows that Appellee breached this duty by failing to issue the verification letter in a timely manner, causing their lost profits. 

At common law, a negligence cause of action consists of (1) a legal duty owed by one person to another, (2) a breach of that duty, and (3) damages proximately resulting from the breach.  
Firestone Steel Prods. Co. v. Barajas
, 927 S.W.2d 608, 613 (Tex. 1996); 
Greater Houston Transp. Co. v. Phillips
, 801 S.W.2d 523, 525 (Tex. 1990).  However, a party’s acts may breach duties in tort, contract, or both, and the nature of the injury most often determines which duty or duties are breached.  
See Jim Walter Homes, Inc. v. Reed
, 711 S.W.2d 617, 618 (Tex. 1986). 
 Here, Appellants seek damages for the profits they would have made had they exercised their options and warrants.  When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract.  
Id
.  Any duties owed to Appellants by Appellee when Appellee initially issued the options and warrants were contractual in nature.  However, we must continue our analysis to account for any change in the relationship after the cashless exercise method and verification letter were proposed.

Duty Of Care

A prerequisite to tort liability is the existence of a legally cognizable duty. 
Barajas
, 927 S.W.2d at 613.  The plaintiff must establish both the existence and the breach of a duty owed to the plaintiff by the defendant to establish liability in tort.  
Phillips
, 801 S.W.2d at 525; 
Otis Eng’g Corp. v. Clark
, 668 S.W.2d 307, 309 (Tex. 1983).  We review the determination of duty in a negligence action on a de novo basis, from the facts surrounding the occurrence in question. 
 See Phillips
, 801 S.W.2d at 525.  In a two-part analysis, we balance the duty factors, listed below.  
See Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins
, 926 S.W.2d 287, 292 (Tex. 1996).  
Then, if these do not weigh in favor of imposing a duty, we consider whether a special relationship exists between the parties under which a duty would arise as a matter of law.  
See id
.

Duty Factors

Imposing a legal duty involves balancing the risk and foreseeability of injury, the social utility of the actor’s conduct, the consequences of imposing the burden on the actor, and any other relevant competing individual and social interests implicated by the facts of the case.  
Tex. Home Mgmt., Inc. v. Peavy
, 89 S.W.3d 30, 33-34 (Tex. 2002); 
Otis Eng’g Corp.
, 668 S.W.2d at 309. Although the formulation and emphasis varies with the facts of each case, three categories of factors have emerged: (1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person injured; and (3) public policy considerations.  
Peavy
, 89 S.W.3d at 34.  Of these factors, foreseeability of the risk is “the foremost and dominant consideration.”  
See Phillips
, 801 S.W.2d at 525
.  Foreseeability means that an actor, as a person of ordinary intelligence, should have anticipated the dangers that his negligent act created for others.  
Lee Lewis Constr., Inc. v. Harrison
, 70 S.W.3d 778, 785 (Tex. 2001).

Prior to Appellants’ request for a verification letter from Appellee around the end of April 2002, the parties’ relationship was purely contractual in nature.  
Appellants’ request for a letter that would provide the reassurance their broker needed to facilitate the exercise of their options and warrants for cash, outside the terms of the governing agreements, and Appellee’s initial agreement to issue the letter in the format requested by Appellants’ broker, may have heralded some change in the parties’ relationship.

However, Appellants retained the ability to exercise their options and warrants under the contractual methods at any time.  Their risk was the same risk faced by any other investor—the rise and fall of stock prices.  
See, e.g., Miga v. Jensen
, 96 S.W.3d 207, 216 (Tex. 2002) (discussing stock appreciation in breach of contract context).  Because these contractual methods were not eliminated, the type of harm Appellants suffered was unforeseeable because reliance on Appellee to issue the letter to their broker was not the sole method to exercise their options and warrants.  
Cf. Otis Eng’g Corp
., 668 S.W.2d at 311 (imposing duty of reasonable care in employer’s exercise of control over intoxicated employee at work to prevent foreseeable risk of harm to public from sending a drunk driver out on the road).

The social utility of Appellee’s conduct and the magnitude of the burden involved in imposing a duty on Appellee to timely issue the letter, although also minimal under these circumstances, still outweigh the low risk to Appellants, who could have exercised their options and warrants as set out in the agreements at any time prior to the issuance of the letter on July 18, 2002. The Appellants who spearheaded the effort to obtain the letter, Kirk and Kennedy, were not novices to securities transactions.  Instead, they were sophisticated investors—Kennedy was an attorney whose practice was concentrated in the securities area, and Kirk was an experienced broker and managing underwriter.  Therefore, based on these particular circumstances, we conclude that Appellee did not owe a legal duty to Appellants.  
See Frank v. Bear, Stearns & Co.
, 11 S.W.3d 380, 385-86 (Tex. App.—Houston [14 Dist.] 2000, pet. denied) (stating that “the application of tort liability is ill-suited to an arena where downside risk is a feature inherent in the concept of the securities market”).  However, we must still consider whether there was a “special relationship” between the parties that would warrant imposition of a legal duty.

Special Relationship

Appellants argue that Appellee owed them a duty of care because of a “special relationship” between a company and its option and warrant holders and claim that industry standards support finding such a duty.

The existence of a “special relationship” that imposes a legal duty is usually hinged on the relationship between the parties.  
See, e.g., Otis Eng’g Corp
., 668 S.W.2d at 311
 (imposing duty based on employer-employee relationship).  Appellants attempt to analogize their possession of options and warrants to purchase Appellee’s stock and Appellee’s agreement to issue the letter as giving rise to the same sort of “special relationship” that gives rise to a duty of good faith and fair dealing between an insurer and its insured, 
see Arnold v. Nat’l County Mut. Fire Ins. Co.
, 725 S.W.2d 165, 167 (Tex. 1987), and the standard of care in professional malpractice claims, 
see CBI NA-CON, Inc. v. UOP Inc.
, 961 S.W.2d 336, 343-44 (Tex. App.—Houston [1st Dist.] 1997, writ denied) (Mirabal, J., dissenting).

However, although Appellants argue that Appellee “was in the unique position to control the timing of Appellants’ transaction” by issuing the letter, and that this gave rise to a “special relationship,” this argument fails to account for their continued retention of rights to receive stock instead of cash, as contemplated by the governing agreements.  This is unlike the insured in 
Arnold
, who confronted unequal bargaining power, 
see
 725 S.W.2d at 167, or the engineers in 
CBI NA-CON
, whom the dissent asserted had a duty to their clients to use the skill and care in the performance of their duties commensurate with the requirements of their profession, 
see
 961 S.W.2d at 343-44.

To support their argument that a tort obligation existed, Appellants cite two federal cases involving debenture holders.  
See Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R. Co.
, 680 F.2d 933 (3d Cir. 1982); 
Broad v. Rockwell Int’l Corp.
, 614 F.2d 418 (5th Cir. 1980).  “Debentures” are corporate bonds not secured by specific property.  
See
 
Scott
, 
supra
 note 3, 
available at 
http://dictionary.reference.com/browse/debenture. 

Pittsburgh Terminal Corp
. involved a corporation that deliberately withheld critical information from convertible debenture holders.
(footnote: 7)  680 F.2d at 940-41.  The court imposed a legal duty on the corporation to refrain from withholding such information when it had an impact on the debenture holders’ economic interests, applying New York contract law’s implied covenant that neither party would do anything to destroy the right of the other party to receive the fruits of the contract.  
Id
. at 941.  Here, in contrast, the jury affirmatively found no fraud, and Appellants do not appeal the trial court’s summary judgment on their breach of contract claim.  Plus, in Texas contract law, there is no general implied covenant of good faith and fair dealing.  
See City of Midland v. O’Bryant
, 18 S.W.3d 209, 215 (Tex. 2000).

Broad
 indicated that if a jury found that the corporation fully complied with the terms of the debenture agreement, then there could be no fiduciary duty claim because the corporation’s duty to the debentureholders was to see that they were treated fairly and that they received what they were entitled to under the agreement.  614 F.2d at 431.  If the jury found breach of contract, then the debentureholders would also have to show bad faith, fraud, or unfair conduct to find a breach of fiduciary duty.  
Id
.  It based the fiduciary duty rationale on the duty of controlling shareholders to the corporation and minority shareholders, extending it to debentureholders and creditors within the confines of the contract. 
 See id.
 at 430-31.  Again, this is inapposite here because there was no breach of the agreements governing the options and warrants.

The third case cited by Appellants involved a stock option holder whose options were governed by an agreement that gave the corporation’s board of directors absolute discretion in adjusting the strike price.  
Hyman v. Ocean Optique Distrib., Inc
., 734 So.2d 546, 547-48 (Fla. Dist. Ct. App. 1999).  The Hyman court held that there was an implicit covenant of good faith in the exercise of such discretion.  
Id
. at 548.  There is no such discretion at issue here.  So while we do take into account the law of other states, federal law, and the views of respected and authoritative restatements and commentators in determining whether a legal duty exists,
 see SmithKline Beecham Corp. v. Doe
, 903 S.W.2d 347, 351 (Tex. 1995), we are not bound by those authorities, 
Penrod Drilling Corp. v. Williams
, 868 S.W.2d 294, 296 (Tex. 1993).  Moreover, 
we decline Appellants’ invitation to impose a duty based on such tenuously analogous circumstances.

Appellants also argue that industry standards establish a basis for foreseeability to support a negligence finding.  They claim that it was industry custom to issue a verification letter for the alternative method they sought to use and so their harm was foreseeable when the letter was not timely issued. General industry practices 
may
 establish a basis for foreseeability to show negligence. 
 See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.
, 51 S.W.3d 573, 581 (Tex. 2001).  However, while industry standards are evidence of the appropriate standard of care, they are not dispositive.  
See Morris v. JTM Materials, Inc
., 78 S.W.3d 28, 50-51 (Tex. App.—Fort Worth 2002, no pet.)
. Appellants cite this court’s opinion in 
American Airlines Employees Federal Credit Union v. Martin 
to support their industry standards argument. 991 S.W.2d 887, 899-900 (Tex. App.—Fort Worth 1999), 
aff’d in part, rev’d in part on other grounds
, 29 S.W.3d 86 (Tex. 2000).  However, in that case, the credit union already had a legal duty to protect its customer’s account.  
Id
. at 899.  We held that any of the credit union’s procedures that failed to conform to that duty could not be commercially reasonable, in spite of evidence of industry standards to the contrary brought by the credit union. 
 Id
. at 899-900.  In contrast, here, the issue is whether there was a legal duty at all. Appellants’ expert testified with regard to the industry standard in the issuance of verification letters, i.e., to respond timely, but also testified that the alternative method Appellants sought to use was “definitely not standard.”
(footnote: 8) Because this was an unusual transaction, we conclude that the expert testimony on general industry practice here was not dispositive in establishing foreseeability.

We hold that under these circumstances, the trial court’s decision to disregard the jury’s verdict as to Appellants’ negligence claim was correct, because, as a matter of law, Appellee owed no legal duty to Appellant.  
See Frank
, 11 S.W.3d at 386.  Because we hold that no legal duty exists in these circumstances, we overrule Appellants’ third issue.

Negligent Undertaking

In their second issue, Appellants claim that this case’s circumstances support a claim for negligent undertaking, that such a claim is not necessarily dependent upon whether physical injury or property damage resulted from the undertaking in question, and that there was legally sufficient evidence to support the jury’s affirmative findings.  They argue that they relied on May, as Appellee’s employee, to timely issue the verification letter and that May’s performance substantially increased their risk of harm.

The negligent undertaking rule states that a party who undertakes, gratuitously or for consideration, to render services to another party may be subject to liability if (1) the party undertook to perform services that it knew or should have known were necessary for the other party’s protection; (2) the party failed to exercise reasonable care in performing those services; and either (3) the other party relied upon the party’s performance, or (4) the party’s  performance increased the other party’s risk of harm.  
See Torrington Co. v. Stutzman
, 46 S.W.3d 829, 838-39 (Tex. 2000) (citing 
Colonial Sav. Ass’n v. Taylor
, 544 S.W.2d 116, 119-20 (Tex. 1976) and 
Restatement (Second) of Torts 
§ 323 (1965)).

A negligent undertaking requires an affirmative act upon which reliance can be based.  
See Entergy Gulf States, Inc. v. Akrotex, Inc
., 40 S.W.3d 201, 206 (Tex. App.—Beaumont 2001, no pet.) (concluding no negligent undertaking when Akrotex complained of Entergy’s failure to act, presented no evidence of reliance, and sought no damages for any physical harm to persons or property).  Here, Appellants presented evidence that Appellee, through May, agreed to issue a verification letter to their broker, and did in fact issue the letter, albeit later than Appellants desired.  Viewing the evidence in a light most favorable to the verdict,
(footnote: 9) Appellee either knew or should have known that Appellants considered this letter necessary to exercise their options and warrants using the alternative method.  However, this letter was not necessary for Appellants’ “protection,” because, at all times, Appellants had the right and ability to exercise their options and warrants under the governing agreements.
(footnote: 10) 
 
Therefore, the trial court did not err in granting Appellee’s motion for JNOV as to Appellants’ negligent undertaking claim, because Appellants failed to prove the first element of that claim.  We overrule Appellants’ second issue.

CONCLUSION

Because we overrule Appellants’ issues as to their negligence and negligent undertaking claims, we do not reach their issue addressing the “economic loss” rule as there are no recoverable damages on their substantive claims.
(footnote: 11)  Accordingly, we affirm the trial court’s JNOV.

Because we affirm the trial court’s JNOV, we do not reach Appellee’s single cross-issue on mitigation of damages.  
See
 
Tex. R. App. P
. 47.1

DIXON W. HOLMAN

JUSTICE

PANEL A:  LIVINGSTON, HOLMAN, and WALKER, JJ.

DELIVERED:  December 14, 2006

FOOTNOTES
1:
See
 
Tex. R. App. P
. 47.4.

2:
An IPO underwriter is an entity that assumes the task of selling securities on behalf of an issuing company.  Barron Chase assumed the financial risk of guaranteeing to Appellee that it would obtain its initial offering price of $6.00 per share.

3:
A “warrant” is “a security that permits its owner to purchase a specific number of shares of stock at a predetermined price. . . . [They] usually have limited lives [and] [t]heir values are considerably more volatile than the values of the underlying stock.”  
See
 
David L. Scott, Wall Street Words
: 
An A to Z Guide to Investment Terms for Today’s Investor 
(2003), 
available at
 http://dictionary.reference.com/browse/warrant.

4:
A “stock option” is defined as “an option to buy or sell a specific number of shares of stock at a fixed price until a specified date.”  
Scott
, 
supra
 note 3, 
available at 
http://dictionary.reference.com/search?q=stock option.

5:
Cumulatively, Appellants held 200,000 options and 61,000 warrants for Appellee’s stock.  Kirk initially received all of them from Barron Chase.  He then transferred the warrants: 9,000 to U.S. Asian Capital, 4,000 to Stewart & Associates, and 48,000 to DeCamp.  Kirk is the 100 percent stockholder of U.S. Asian Capital.  Kirk transferred the 200,000 options to DeCamp, who, at Kirk’s request, transferred 15,000 to Kennedy and 15,000 to a non-Appellant; she retained 170,000.

6:
An exercise price is also known as a “strike price.”  This is the price at which the warrant could be used to purchase stock.

7:
A “convertible debenture” is a debenture which can be converted into stock at the option of the holder at a specified date in the future. Investorwords.com, Convertible debenture, http://www.investorwords.com/1112/convertible_debenture.html (last visited

Nov. 22, 2006).

8:
He also testified that he had never specifically been requested to render a verification letter.  Kennedy testified that this type of transaction, “cashless exercise with brokers at risk,” is not common.

9:
The number of phone calls made by Appellants to May between April 26 and July 18, the content and utility of the “sample” letter Arnold sent to May, and the timing of Appellants’ request for changes to May’s original verification letter draft were all disputed at trial.  We credit this evidence as favorable to the jury’s finding of negligent undertaking.  
See City of Keller
, 168 S.W.3d at 807. 

10:
Moreover, under the alternative method, the only protection the verification letter could have provided was to the broker, rather than Appellants, because this was a “brokers at risk” transaction.

11:
See
 
Tex. R. App. P. 
47.1  We note that tort damages are generally not recoverable unless the plaintiff suffers an injury that is independent and separate from the economic losses that would be recoverable under a breach of contract claim.  
See Heil Co. v. Polar Corp.
, 191 S.W.3d 805, 815 (Tex. App.—Fort Worth 2006, pet. filed).