AMERICAN AIRLINES EMPLOYEES FEDERAL CREDIT UNION, Petitioner,

v.

Tim MARTIN, Respondent.

No. 99–0320.

Supreme Court of Texas.

Argued Jan. 26, 2000.

Decided Sept. 7, 2000.

---

8. *See Morgan Stanley,* 958 S.W.2d at 179 (quoting *Holloway,* 898 S.W.2d at 797.).

9. *Holloway,* 898 S.W.2d at 797.

Stephen L. Baskind, Karen Kohler Fitzgerald, Kleiman, Lawrence, Baskind and Fitzgerald, L.L.P., Dallas, for petitioner.

Kern A. Lewis, Lewis & Hutchison, Fort Worth, for Respondent.

Justice ENOCH delivered the opinion of the Court, in which Justice HECHT, Justice OWEN, Justice BAKER, Justice HANKINSON, Justice O'NEILL, and Justice GONZALES join.

We must decide whether former Section 4.406(d) of the Texas Business and Commerce Code,[1] which requires a bank customer to discover and report an unauthorized signature on an item to the bank within one year, can be modified by agreement to sixty days. We hold that it can. We further conclude that, because the parties here entered into an enforceable agreement, the credit union customer failed to give the credit union the required notice for ten of the fourteen transactions at issue. We therefore reverse in part and affirm in part the court of appeals' judgment.

## I. Background

Petitioner American Airlines Employees Federal Credit Union ("Credit Union") is a federal credit union whose members are primarily employees of American Airlines and certain related entities, and their spouses and families. Respondent Tim Martin is an American Airlines employee.

In 1990, Martin opened a savings account (called a "share account") at the Credit Union. To open the account, he completed and signed a Credit Union membership application, which provided that his account would be "subject to any and all rules, regulations, bylaws and policies of the Credit Union and its Board of Directors now in effect and as changed, amended or adopted hereafter." Thereafter, he received quarterly account statements.

In May 1994, the Credit Union adopted a Deposit Account Agreement and Disclosures (the "Deposit Agreement").

The Deposit Agreement contained the following paragraph:

1. *Account Statements.* You are responsible for promptly examining each account statement. Any objection that you may have respecting any item shown on a statement will be waived unless made in writing to us, and received on or before the sixtieth (60th) day following the date the statement is mailed, subject to applicable law. You agree that we will not be liable for any forged or altered item drawn on or deposited to your account if you fail to notify us within that sixty-day period. . . .

The Credit Union notified its members about this Deposit Agreement through its newsletter and account statements. As well, the Credit Union specifically noted on the account statements that any errors on the statement were to be reported to the Credit Union within sixty days. Although the Credit Union did not mail out copies of the Deposit Agreement to all its members, it notified them that copies could be picked up at any of its branches, and that they could call the Credit Union to request a copy. In May 1994, Martin neither picked up a copy of the Deposit Agreement nor requested one.

On June 10, 1995, the Credit Union received a Membership Account Change Card in the mail, adding Molly Blair to Martin's account as a joint owner. Blair was Martin's girlfriend and also a member of the Credit Union. She had recently added Martin's name to her own account. The change card contained a signature purporting to be Martin's. The Credit Union changed the ownership status of the account after verifying the personal and

1. TEX. BUS. & COM.CODE ANN. § 4.406(d) (Vernon 1994), *amended by* Acts 1995, 74th Leg., ch. 921, § 4, effective Jan. 1, 1996 (current version at TEX. BUS. & COM.CODE ANN. § 4.406(f) (Vernon Supp.2000)). Unless otherwise specified, all references in this opinion are to the version of the statute in effect when the transactions at issue took place, found generally at Acts 1967, 60th Leg., p. 2343, ch. 785, § 1.

account information on the card and comparing Martin's purported signature on the change card to his original signature card. Martin's signature on the change card turned out to be a forgery.

Between June 12 and November 16 of 1995, Blair transferred a total of $49,800 from Martin's account to her own. She made fourteen transfers altogether—twelve by telephone and two in person. To execute a telephone transfer, Blair would call the Credit Union and speak to a teller, who would verify Blair's identity by confirming certain personal and account information. The teller would complete the transaction by preparing and signing a "journal voucher" that identified the date of the transaction, the amount of the transfer, and the accounts involved. These journal vouchers were then mailed to Martin's address, on the day of the transaction or the next day. The Credit Union also prepared journal vouchers for those transfers that Blair requested in person; these vouchers were given to Blair directly.

In addition to the twelve journal vouchers, the Credit Union also mailed two quarterly statements to Martin during the period that Blair made her withdrawals. The first was mailed between July 8 and July 20, 1995, and the second was mailed between October 6 and October 18, 1995. These statements documented ten of Blair's transfers (the other four being made after the period covered by the second statement). The first quarterly statement listed Blair as a joint owner of the account, and disclosed that she had made two withdrawals totaling $8,000. The second quarterly statement again listed Blair as a joint owner and revealed that she had made eight more withdrawals, totaling $36,500. Martin denies receiving these statements or the journal vouchers, although there is no dispute that they were mailed to the correct address. In any event, he did not contact the Credit Union to request either quarterly statement.

On December 20, 1995, Martin went to the Credit Union to make a deposit and discovered that the balance in his account was not what he expected it to be. He immediately notified the Credit Union of the discrepancy.

Ultimately, Martin sued the Credit Union to recover the $49,800 transferred from his account. He alleged breach of contract, negligence, and breach of the Credit Union's duties to him under Articles 3 and 4 of the Uniform Commercial Code.[2] The Credit Union defended principally on the basis of Texas Business and Commerce Code section 4.406, which requires a bank customer to discover and report his unauthorized signature on an item within a year after the item and the account statement documenting the transaction are made available to the customer.[3] If the customer does not do so, he is precluded from asserting his unauthorized signature against the bank.[4]

The Credit Union further maintained that the Deposit Agreement reduced the one-year period set out in section 4.406(d) to sixty days, and that Martin had failed to notify it of the majority of Blair's unauthorized withdrawals within that time period. Additionally, the Credit Union claimed the protection of other defenses contained in section 4.406(b).[5]

Following a bench trial, the trial court rendered judgment in Martin's favor for $49,800, plus interest and attorney's fees. The Credit Union appealed, and the court of appeals affirmed.[6] The court of appeals

---

2. *See* Chapters 3 and 4 of the Texas Business and Commerce Code, made applicable to credit unions by TEX. FIN.CODE ANN. § 149.001 (Vernon 1998) (formerly TEX.REV.CIV. STAT. ANN. art. 2461–12.02 (Vernon Supp.2000)).

3. TEX. BUS. & COM.CODE ANN. § 4.406(a),(d), *amended by* Acts 1995, 74th Leg., ch. 921, § 4.

4. *Id.* § 4.406(d).

5. *See id.* § 4.406(b).

6. 991 S.W.2d 887.

agreed with the trial court's conclusion that section 4.406 did not apply because Blair did not use any "unauthorized signatures" to make withdrawals from Martin's account.[7] The court of appeals also agreed with the trial court that the sixty-day notice provision in the Deposit Agreement was vague, ambiguous and inconspicuous, and that Martin did not intentionally and knowingly relinquish the right to a year to give notice contained in section 4.406(d).[8] Finally, the court of appeals concluded that sufficient evidence supported the trial court's findings that the Credit Union had breached its contract with Martin and had been negligent in accepting the Account Change Card adding Blair to Martin's account.[9]

## II. UCC Section 4.406

Whether section 4.406 applies is a conclusion of law, which we review *de novo*.[10] Article 4 of the UCC, of which section 4.406 is a part, establishes the rights and duties between banks and their customers regarding deposits and collections.[11] Under Article 4's liability scheme, a bank is liable to its customer if it charges the customer's account for an item that is not properly payable from that account.[12] An item with an unauthorized signature is not properly payable.[13]

Section 4.406 specifies the customer's corresponding obligation concerning items with unauthorized signatures:

(a) When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or ... otherwise in a rea-

sonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof.[14]

Section 4.406 also provides the bank with certain defenses when the customer fails to comply with this obligation. The Credit Union here relied on two of these defenses. First, the customer cannot assert his unauthorized signature against the bank when one wrongdoer makes a series of unauthorized transactions on the same account if the customer fails to discover and report the first unauthorized transaction within fourteen days.[15] This defense is not available when the bank has failed to exercise ordinary care in paying the items.[16]

Second, and the defense on which the Credit Union places the most emphasis, the customer is absolutely precluded from asserting his unauthorized signature on an item against the bank if the customer fails to discover and report the unauthorized signature within a year after the bank makes available the item and the account statement showing the transaction:

(d) Without regard to care or lack of care of either the customer or the bank a customer who does not within one year from the time the statement and items are made available to the customer ... discover and report his unauthorized signature or any alteration on the face

7. *Id.* at 894–95.

8. *Id.* at 899.

9. *Id.* at 898–99.

10. *See, e.g., Barber v. Colorado Indep. Sch. Dist.*, 901 S.W.2d 447, 450 (Tex.1995).

11. *See generally* TEX. BUS. & COM.CODE ANN. § 4.101, cmt., *amended by* Acts 1995, 74th Leg., ch. 921, § 4.

12. *Id.* § 4.401(a).

13. *Putnam Rolling Ladder Co. v. Manufacturers Hanover Trust Co.*, 74 N.Y.2d 340, 547 N.Y.S.2d 611, 546 N.E.2d 904, 906 (1989).

14. TEX. BUS. & COM.CODE ANN. § 4.406(a), *amended by* Acts 1995, 74th Leg., ch. 921, § 4.

15. *Id.* § 4.406(b)(2).

16. *Id.* § 4.406(c).

or back of the item ... is precluded from asserting against the bank such unauthorized signature or ... such alteration.[17]

This statutory scheme reflects an underlying policy decision that furthers the UCC's "objective of promoting certainty and predictability in commercial transactions."[18] The UCC facilitates financial transactions, benefitting both consumers and financial institutions, by allocating responsibility among the parties according to whoever is best able to prevent a loss.[19] Because the customer is more familiar with his own signature, and should know whether or not he authorized a particular withdrawal or check, he can prevent further unauthorized activity better than a financial institution, which may process thousands of transactions in a single day.[20] Section 4.406 acknowledges that the customer is best situated to detect unauthorized transactions on his own account by placing the burden on the customer to exercise reasonable care to discover and report such transactions.[21] The customer's duty to exercise this care is triggered when the bank satisfies its burden to provide sufficient information to the customer. As a result, if the bank provides sufficient information, the customer bears the loss when he fails to detect and notify the bank about unauthorized transactions.

The court of appeals, in failing to be guided by these policy considerations, erred. The court of appeals erred in concluding that section 4.406 doesn't apply (and therefore offers the Credit Union no defenses) because Blair did not use "items" with "unauthorized signatures" to withdraw funds from Martin's account. To the contrary, under the circumstances of this case, the journal vouchers are items with unauthorized signatures sufficient to invoke section 4.406.

First, the journal vouchers are "items" as that term is used in section 4.406. Section 4.104(a)(7) says that "item" means "any instrument for the payment of money even though it is not negotiable but does not include money."[22] The official comments to this section note that "item" includes both negotiable and non-negotiable paper.[23] "Instrument," as it is used in Article 4, is not explicitly defined, but Black's Law Dictionary defines an "instrument" as "[a]n unconditional promise or order to pay a fixed amount of money, with or without interest or other fixed charges described in the promise or order."[24] Because the journal vouchers are instruments reflecting Blair's orders to pay a fixed amount of money from Martin's account to her own, they are items.

Our conclusion is consistent with decisions from a variety of other jurisdictions that have read "item" broadly, holding that deposit slips,[25] savings account withdrawal orders,[26] and even handwritten notes ask-

17. *Id.* § 4.406(d).

18. *Putnam*, 547 N.Y.S.2d 611, 546 N.E.2d at 908. *See also* Tex. Bus & Com.Code Ann. § 1.101.

19. *See id.*

20. *See* Tex. Bus. & Com.Code Ann. § 4.406 cmt. 5, *amended by* Acts 1995, 74th Leg., ch. 921, § 4; *see also Minskoff v. American Express Travel Related Servs. Co.*, 98 F.3d 703, 709 (2nd Cir.1996); *Woods v. MONY Legacy Life Ins. Co.*, 84 N.Y.2d 280, 617 N.Y.S.2d 452, 641 N.E.2d 1070, 1071 (1994); *Putnam*, 547 N.Y.S.2d 611, 546 N.E.2d at 906.

21. *See Putnam*, 547 N.Y.S.2d 611, 546 N.E.2d at 906; *see also Minskoff*, 98 F.3d at 709;

*Woods*, 617 N.Y.S.2d 452, 641 N.E.2d at 1071.

22. Tex. Bus. & Com.Code Ann. § 4.104(a)(7), *amended by* Acts 1995, 74th Leg., ch. 921, § 4.

23. *Id.* at cmt. 4.

24. Black's Law Dictionary 802 (7th ed.1999).

25. *Concrete Materials Corp. v. Bank of Danville & Trust Co.*, 938 S.W.2d 254, 258 (Ky. 1997).

26. *See, e.g., Boutros v. Riggs Nat'l Bank, D.C.*, 655 F.2d 1257, 1259 n. 2 (D.C.Cir.1981); *Shaw v. Union Bank & Trust Co.*, 640 P.2d

ing for cashiers' checks [27] are items.

■ Second, the journal vouchers bore the necessary unauthorized signatures. Under the UCC, the term "signed" includes "any symbol executed or adopted by a party with the present intention to authenticate a writing," [28] not limited to a complete written signature.[29] Each of the fourteen journal vouchers bears the initials of the teller who created it, and each was also signed by that teller. Thus, the journal vouchers are items with signatures.

Martin points out that the statute requires that the items bear *Martin's* unauthorized signature. True, but the statute does not limit its definition of "unauthorized signature" to pure forgeries. An unauthorized signature includes one made without actual, implied or apparent authority.[30] This definition encompasses agency concepts and recognizes that a person's unauthorized signature can be broader than simply a forgery of his name. The UCC specifically permits a person to appoint an agent or representative to sign on his behalf.[31] If the Credit Union's tellers had executed the transfers at Martin's direction, their signatures on the journal vouchers would be authorized and would serve the same purpose as Martin's signature with respect to the account.[32] We accept Martin's insistence that he did not authorize any of Blair's withdrawals, nor did he authorize her to be a joint account owner. Therefore, the tellers signed the journal vouchers and effected the transfers without any authority from Martin, the account owner. And thus the signatures were unauthorized.

Indeed, if Martin were correct that section 4.406 applied only to forged signatures, this section would not apply even if Blair, acting on the authority of the forged account change card, wrote checks for every withdrawal, because each check would carry her signature, not Martin's. The statute cannot be read so narrowly.

The UCC admonishes that it "shall be liberally construed and applied to promote its underlying purposes and policies," [33] two of which are "to permit the continued expansion of commercial practices through custom, usage and agreement of the parties" and "to make uniform the law among the various jurisdictions." [34] Applying section 4.406 in the circumstances of this case facilitates the continued expansion of commercial practices because it allows parties who engage in transactions that have developed since the UCC was first enacted to anticipate what their rights and responsibilities are with respect to such transactions. Here, there was evidence that the Credit Union permits its members to conduct business by telephone because many of them travel almost constantly and would otherwise be unable to access their accounts. Both the Credit Union and its members benefit if the UCC's uniform and predictable rules, which already apply to analogous transactions, also apply to these types of transactions.

And as we have said, applying section 4.406 here is consistent with those cases from other jurisdictions that apply that

953, 954 (Okla.1981); *Burnette v. First Citizens Bank & Trust Co.,* 48 N.C.App. 585, 269 S.E.2d 317, 319 (1980); *Coleman v. Brotherhood State Bank,* 3 Kan.App.2d 162, 592 P.2d 103, 112 (1979).

**27.** *Borowski v. Firstar Bank Milwaukee, N.A.,* 217 Wis.2d 565, 579 N.W.2d 247, 253 (App. 1998).

**28.** TEX. BUS. & COM.CODE ANN. § 1.201(39), *amended by* Acts 1995, 74th Leg., ch. 921, § 2; Acts 1999, 76th Leg., ch. 414, §§ 2.12, 2.13.

**29.** *Id.* at cmt. 39.

**30.** *Id.* § 1.201(43).

**31.** *Id.* § 3.403.

**32.** *See id.*

**33.** *Id.* § 1.102(a).

**34.** *Id.* § 1.102(a)(2), (3).

section to savings withdrawal orders.[35] Since Blair's transactions with respect to Martin's accounts were conceptually no different from savings account withdrawals, we see no reason why a different rule should apply here.

■ Further, as we have said, the purpose of section 4.406 is to place the burden on those best able to detect unauthorized transactions so that further unauthorized transactions can be prevented,[36] and this burden includes the risk of nonreceipt of account statements.[37] Necessarily then, the burden must fall on the customer, the one most familiar with the underlying transaction. This duty to detect and report is triggered when the bank meets its burden to provide the customer with enough information that the customer can detect that the unauthorized transaction has occurred.[38] In this case, the journal vouchers provided the date and time of the transaction, Martin's account number, the amount of the withdrawal from Martin's account, Blair's account number, and the corresponding amount of the deposit to Blair's account. They were sent to Martin's address. This information should have been enough to prod Martin to complain that the transaction was unauthorized. Thus, our holding that the journal vouchers are items with unauthorized signatures comports with the purposes of section 4.406.

We recognize that in *La Sara Grain Co. v. First National Bank of Mercedes*, we concluded that section 4.406 did not provide a defense to the defendant bank for an unauthorized transfer made from La Sara's account at the oral request of its general manager because no unauthorized signature was used.[39] We did not engage in any substantive analysis on this point. In *La Sara Grain*, the parties did not assert that anything like the journal vouchers were prepared, signed, and sent to the customer; indeed, a review of the briefs reveals that the petitioner argued, and the bank did not contest, that "there is no signature nor any writing whatsoever that even purportedly serves as a basis for the Bank's transfer of La Sara's money from its account [to] that of the personal account of [the general manager]."[40] The Credit Union attempts to distinguish *La Sara Grain* simply because of the existence of the journal vouchers. But we think the critical distinction is that here, the Credit Union sent the journal vouchers to Martin, and those vouchers contained enough information to inform him of Blair's unauthorized transactions. In *La Sara Grain*, there was no indication that such information had been provided to the customer with respect to the oral transfer.

■ Although the court of appeals determined that section 4.406 did not apply here at all, it also determined that 4.406(d) granted Martin the right to one year to give notice to the Credit Union of unauthorized transactions in his account, which the Deposit Agreement did not waive. These conclusions, of course, are contradictory—if 4.406 doesn't apply, then 4.406(d) gives Martin no substantive rights of any kind. The Credit Union more correctly argues that, rather than granting Martin substantive rights, section 4.406 imposed a duty on him to discover and report his unauthorized signature on an item.

---

35. *See id.*

36. See *id.* § 4.406 cmt. 3, *amended by* Acts 1995, 74th Leg., ch. 921, § 4; *see also Concrete Materials Corp.*, 938 S.W.2d at 257.

37. *See Stowell v. Cloquet Co–op Credit Union*, 557 N.W.2d 567, 571–72 (Minn.1997) (when account statements are mailed to the proper address, the risk of nonreceipt falls on the account holder).

38. *See* 5 WILLIAM D. HAWKLAND, UNIFORM COMMERCIAL CODE SERIES § 4.406:2 (West 1999).

39. 673 S.W.2d 558, 564 (Tex.1984).

40. *See* Application for Writ of Error filed December 23, 1982, *La Sara Grain Company v. First National Bank of Mercedes*, case no. C–1784.

Section 4.406's title is unequivocal: "Customer's Duty to Discover and Report Unauthorized Signature or Alteration." The comments to the section are equally straightforward, noting that subsection (a) "states **the general duty of a customer** to exercise reasonable care and promptness to examine his bank statements and items to discover his unauthorized signature or any alteration and to promptly notify the bank if he discovers an unauthorized signature or alteration."[41] The remainder of section 4.406 establishes the consequences if the customer fails to comply with this duty. To assert a claim against the bank based on an unauthorized signature (absent any allegation that the bank did not act in good faith), a customer must comply with the duty to discover and report within one year.[42]

Martin, however, contends that the one-year notice period establishes a substantive right to a claim for damages. We disagree. Section 4.401(a), which states that a bank may only charge items against a customer's account that are properly payable, is the source of a customer's substantive right to recover.[43] The notice requirement of section 4.406(d), on the other hand, is similar to a condition precedent—Martin's ability to recover for unauthorized transactions is conditioned upon his discovering and reporting those transactions within the specified time period.[44]

Because section 4.406 establishes duties and not rights, the court of appeals' analysis of whether the Deposit Agreement adequately identified the right it purported to waive is also misplaced. The question is simply whether the Credit Union and Martin agreed to shorten the notice period of section 4.406 to sixty days and, if so, whether that agreement is enforceable.

Section 4.103(a) permits parties to vary the effect of Article 4's provisions by agreement, as long as that agreement does not "disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care," or "limit the measure of damages for such lack or failure."[45] The comments to this section note that it "confers blanket power to vary all provisions of the Article by agreements of the ordinary kind.... In the absence of a showing that the standards manifestly are unreasonable, the agreement controls."[46] The UCC itself, however, does not directly answer the question of how parties reach an enforceable agreement.[47]

The Credit Union points to certain federal regulations that specify the disclosures that federal law requires credit unions to make to their customers, arguing that because it complied with these regulations, the Deposit Agreement must be enforceable.[48] These federal regulations do provide some guidance in that they indicate that a customer can be bound by provisions of a deposit agreement distributed in the manner that the Deposit Agreement in this case was distributed. They do not entirely answer the question before us, however, because the federal regulations do not require a credit union's

**41.** Tex. Bus. & Com.Code Ann. § 4.406, cmt. 2 (emphasis added), *amended by* Acts 1995, 74th Leg., ch. 921, § 4.

**42.** *La Sara Grain*, 673 S.W.2d at 561–562.

**43.** See Tex. Bus. & Com.Code Ann. § 4.401(a), *amended by* Acts 1995, 74th Leg., ch. 921, § 4.

**44.** *See, e.g., Gerber v. City Nat'l Bank of Florida*, 619 So.2d 328, 329 (Fla.Dist.Ct.App. 1993); *Indiana Nat'l Corp. d/b/a Indiana Nat'l Bank v. FACO, Inc.*, 400 N.E.2d 202, 205, (Ind.Ct.App.1980); *Jensen v. Essexbank*, 396 Mass. 65, 483 N.E.2d 821, 822 (1985); *Weiner v. Sprint Mortgage Bankers Corp.*, 235 A.D.2d 472, 652 N.Y.S.2d 629, 631 (N.Y.App.Div. 1997).

**45.** Tex. Bus. & Comm.Code Ann. § 4.103(a), *amended by* Acts 1995, 74th Leg., ch. 921, § 4.

**46.** *Id.* at cmt. 2.

**47.** See *id.* § 1.201(3), *amended by* Acts 1995, 74th Leg., ch. 921, § 2; Acts 1999, 76th Leg., ch. 414, §§ 2.12, 2.13.

**48.** *See* 12 C.F.R. §§ 707.3–707.4 (2000).

account disclosures to contain a provision like the one at issue, and do not purport to make such a provision enforceable under state law.[49] Consequently, we look to Texas law.

 When he opened his account at the Credit Union, Martin signed the Credit Union membership application, which as noted above, contained the statement, "I ... agree that this account and all agreements pertaining thereto are subject to any and all rules, regulations, bylaws and policies of the Credit Union and its Board of Directors now in effect and as changed, amended or adopted hereafter." Such signature cards establish a contract between banking institution and customer,[50] regardless of whether the customer reads all the provisions to which he is agreeing.[51] In May 1994, the Credit Union adopted the Deposit Agreement containing the sixty-day notice provision, notified all its members, including Martin, made the agreement available, although Martin did not attempt to obtain a copy at the time, and sent account statements specifying the critical sixty-day time frame. Thereafter, Martin continued to maintain his account at the Credit Union. These actions are, as a matter of law, sufficient to demonstrate that the parties agreed to be bound by the terms of the Deposit Agreement. Consequently, the sixty-day notice provision in the Deposit Agreement is enforceable.

We note that this conclusion is also consistent with decisions from other jurisdictions, which have upheld shortened notice periods.[52] And at least two Texas appellate courts have already enforced shortened notice periods.[53]

 Martin contends that the Deposit Agreement is a contract of adhesion, and that the sixty-day notice provision is vague, ambiguous and inconspicuous. But contracts are not unconscionable simply because they are adhesionary.[54] Martin has not established, and the trial court did not find, that the Deposit Agreement is unconscionable. Although Martin does not say so directly, we read these arguments as invoking the fair notice doctrine, which mandates that a party's effort to disclaim liability for its own negligence must meet two requirements.[55] Those requirements are: (1) that a party's intent to be released from liability caused by its own future negligence must be expressed in unambiguous terms within the contract; and (2) that the clause must be conspicuous, as the UCC defines that term.[56] We understand Martin to argue that the sixty-day notice provision is unenforceable because it fails to meet these standards.

 But the fair notice doctrine does not apply here. That doctrine specifies how a disclaimer of liability for negligence can be made effective. The UCC, howev-

**49.** *See* 12 C.F.R. pt. 707 app. C, Official Staff Interpretations, § 707.3 (2000).

**50.** *See, e.g.,* TEX. BUS. & COM.CODE ANN. § 4.103, cmt. 2, *amended by* Acts 1995, 74 th Leg., ch. 921, § 4; *Stauffer v. Henderson,* 801 S.W.2d 858, 861 (Tex.1990); *see also Perdue v. Crocker Nat. Bank,* 38 Cal.3d 913, 216 Cal.Rptr. 345, 702 P.2d 503, 509–510 (1985); *Haseman v. Union Bank of Mena,* 268 Ark. 318, 597 S.W.2d 67, 69 (1980).

**51.** 2 RICHARD A. LORD, WILLISTON ON CONTRACTS § 6.43 (4 th ed.1991).

**52.** *See, e.g., Borowski,* 579 N.W.2d at 252–53; *Stowell,* 557 N.W.2d at 568; *New York Credit Men's Adjustment Bureau, Inc. v. Manufacturers Hanover Trust Co.,* 41 A.D.2d 912, 343 N.Y.S.2d 538, 540 (N.Y.App.Div.1973); *Parent Teacher Ass'n, Pub. Sch. 72 v. Manufacturers Hanover Trust Co.,* 138 Misc.2d 289, 524 N.Y.S.2d 336, 340 (N.Y.Civ.Ct.1988).

**53.** *See Basse Truck Line, Inc. v. First State Bank,* 949 S.W.2d 17, 21–22 (Tex.App.—San Antonio 1997, writ denied); *Tumlinson v. First Victoria Nat'l Bank,* 865 S.W.2d 176, 177 (Tex.App.—Corpus Christi 1993, no writ).

**54.** *In re Oakwood Mobile Homes,* 987 S.W.2d 571, 574 (Tex.1999) (per curiam).

**55.** *Littlefield v. Schaefer,* 955 S.W.2d 272, 274 (Tex.1997).

**56.** *Id., citing Dresser Indus., Inc. v. Page Petroleum, Inc.,* 853 S.W.2d 505, 508 (Tex.1993).

er, does not permit a bank to disclaim liability for its own failure to exercise ordinary care even if the disclaimer is made in proper form.

The UCC draws a careful distinction between disclaiming liability, which it does not permit the bank to do, and limiting the time period during which a bank can be charged with liability for paying unauthorized items, which it permits the bank to do.[57] The Deposit Agreement is consistent with the UCC. The only question therefore becomes whether the agreed-upon time for giving notice is unreasonably short. If it is, then it in effect disclaims liability for a lack of ordinary care and can't be enforced consistent with the UCC regardless of whether the fair notice doctrine is satisfied. Martin does not argue, however, that sixty days is an unreasonable period of time. And we note that other jurisdictions have enforced shortened notice periods ranging from fourteen to sixty days.[58]

Some courts have observed that shortened notice periods are only enforceable if there is no evidence that the bank has failed to exercise ordinary care.[59] Those courts reason that a shortened notice period in effect disclaims the bank's responsibility to exercise ordinary care, if the bank in fact has not exercised care. We decline to follow this reasoning because it confuses the concept of the bank's ongoing duty to exercise ordinary care in paying items from a customer's account with the con-

cept that the bank can only be charged with liability for a specific period of time. Moreover, the Deposit Agreement does not excuse the Credit Union from its ongoing duties to exercise ordinary care and pay only authorized items. So long as the customer complies with the corresponding duty to discover and report within the relevant time period—whether it is one year, sixty days, or something else—the bank can be held liable for any failure to exercise due care. And shortening the notice period does not disclaim the bank's liability for negligence in the future, inasmuch as the time period for notice as to on-going transactions starts over again each time the bank makes a new statement and items available to the customer.[60]

██ Martin further argues that the notice requirement is unenforceable because it violates section 16.071 of the Civil Practice and Remedies Code. That statute declares that a contractual provision "that requires a claimant to give notice of a claim for damages as a condition precedent to the right to sue on the contract" is void if it requires notification within less than ninety days.[61] But section 16.071 by its terms does not apply here, when the notice to be given is not notice of a claim for damages, but rather notice of unauthorized transactions.[62] The purpose of this notice requirement, as we have discussed, is to prevent further unauthorized transactions.

---

**57.** Tex. Bus. & Comm.Code Ann. § 4.103(a), *amended by* Acts 1995, 74th Leg., ch. 921, § 4. *See also, Borowski,* 579 N.W.2d at 251–52; *Stowell,* 557 N.W.2d at 568; *New York Credit Men's Adjustment Bureau, Inc.,* 343 N.Y.S.2d at 540; *Parent Teacher Ass'n, Pub. Sch. 72,* 524 N.Y.S.2d at 340.

**58.** *See, e.g., Concrete Materials Corp.,* 938 S.W.2d at 257 (60 days); *Stowell,* 557 N.W.2d at 574 (20 days); *Coine v. Manufacturers Hanover Trust Co.,* 16 U.C.C. Rep. Serv. 184, 185–86 (N.Y.App.Div.1975) (14 days); *New York Credit Men's Adjustment Bureau,* 343 N.Y.S.2d at 539–40 (30 days); *Parent Teacher Ass'n.,* 524 N.Y.S.2d at 339–40 (fourteen days); *Borowski,* 579 N.W.2d at 250 (fourteen days).

**59.** *See, e.g., Stowell,* 557 N.W.2d at 568; *Knight Publ'g Co., v. Chase Manhattan Bank,*

*N.A.,* 125 N.C.App. 1, 479 S.E.2d 478, 488 (1997); *Herzog, Engstrom & Koplovitz P.C. v. Union Nat'l Bank,* 226 A.D.2d 1004, 640 N.Y.S.2d 703, 704 (N.Y.App.Div.1996); *New York Credit Men's Adjustment Bureau,* 343 N.Y.S.2d at 540.

**60.** *See, e.g., Concrete Materials,* 938 S.W.2d at 257; *Parent Teacher Ass'n.,* 524 N.Y.S.2d at 340.

**61.** Tex. Civ. Prac. & Rem.Code Ann. § 16.071(a) (Vernon 1997 & Supp.2000).

**62.** *See St. Paul Mercury Ins. Co. v. Tri–State Cattle Feeders, Inc.,* 638 S.W.2d 868, 869 (Tex. 1982).

Indeed, if the customer gives prompt notice, the funds might be recovered and the customer may not even have a claim for damages.

The Deposit Agreement required Martin to give notice within sixty days after the account statements showing Blair's transfers were mailed. Pursuant to section 4.406(d), Martin cannot assert his unauthorized signature against the Credit Union as to any transfers for which he did not give timely notice. The parties stipulated that: (1) the first quarterly statement, which showed withdrawals by Blair on June 12 and June 27, 1995, was mailed by July 20, 1995; and (2) the second quarterly statement, which showed withdrawals by Blair on July 12, July 24, July 28, August 7, August 21, August 30, September 11 and September 26, 1995, was mailed by October 18, 1995. The parties also agree that Martin first complained to the Credit Union about Blair's transfers on December 20, 1995. Thus, Martin first gave notice to the Credit Union that Blair's transfers were unauthorized more than sixty days after both statements were mailed. Because his claims are all premised on unauthorized signatures, section 4.406 bars his recovery for all of Blair's transfers that appear on the two statements.[63]

### III. Section 4.406(b)(2)

██ Blair's final transactions, on October 4, October 12, October 23 and November 16, were not documented on any statement sent to Martin before he discovered Blair's withdrawals on December 20, 1995. Because under the Deposit Agreement the sixty-day time period runs from the date the statement showing the unauthorized transactions is mailed, his claims with respect to these transactions are not barred

by a failure to give notice. The Credit Union argues that Martin cannot recover as to these four transactions because of section 4.406(b)(2) of the statute, which prohibits recovery when a bank customer fails to detect and report within fourteen days the first unauthorized transaction in a series by the same wrongdoer.[64] This section does not apply, however, when the bank fails to exercise ordinary care in paying the items.[65]

The court of appeals affirmed the trial court's finding that the Credit Union was negligent in accepting the account change card with the forged signature.[66] The Credit Union does not argue that this negligence is separate from a failure to exercise ordinary care in paying the items. It does, however, argue that the trial court should not have admitted testimony from Martin's expert about commercial practices in the banking industry, in light of the expert's lack of familiarity with credit unions particularly. We agree with the court of appeals' conclusion that the evidence supports the trial court's conclusion that the Credit Union was negligent in accepting the account change card.[67] We therefore affirm the court of appeals' judgment as to these four transfers.

### IV. UCC Article 4A

██ Martin also suggests that the transactions here are governed by Article 4A of the UCC, rather than Article 4. Article 4A applies to "funds transfers," also known in the banking industry as "wholesale wire transfers."[68] Aside from the bare assertion that Blair's telephone transactions resemble an example contained in the comments to Article 4A, Martin does not explain how they fit within

---

63. *See Siecinski v. First State Bank of East Detroit,* 209 Mich.App. 459, 531 N.W.2d 768, 771 (1995).

64. Tex. Bus. & Com.Code Ann. § 4.406(b)(2), *amended by* Acts 1995, 74th Leg., ch. 921, § 4.

65. *Id.* § 4.406(c).

66. 991 S.W.2d at 898–99.

67. *See* 991 S.W.2d at 899; *see also* Tex. Fin. Code Ann. § 149.001.

68. *See* Tex Bus & Com.Code Ann. § 4A.102, cmt.

that statute's detailed framework. Nor does he explain what the effect of applying Article 4A to the facts here would be. Rather, we conclude that Article 4A does not apply.

"Article 4A governs a specialized method of payment referred to ... as a funds transfer but also commonly referred to in the commercial community as a wholesale wire transfer." [69] That is not the circumstance we have here.

## V. Conclusion

We hold that section 4.406 of the Business and Commerce Code places a duty on bank customers to discover and report account irregularities. We further hold that the one-year notice period of section 4.406(d) can be modified by agreement, and that the Credit Union and Martin entered into an enforceable agreement to reduce the notice period to sixty days. Martin failed to notify the bank within sixty days as to ten of Blair's fourteen withdrawals. We therefore reverse the judgment of the court of appeals as to those ten transactions and render judgment that Martin take nothing on those claims. We affirm the judgment of the court of appeals as to the remaining four transactions, and remand to the trial court for rendition of judgment consistent with this opinion.

Justice ABBOTT filed a dissenting opinion, in which Chief Justice PHILLIPS joined.

Justice ABBOTT, dissenting, joined by Chief Justice PHILLIPS.

To achieve its result, the Court must fabricate a fiction that a bank teller's signature is Martin's signature, even though Martin was a stranger to the transaction. Because I cannot go along with that fic-

tion, I respectfully dissent, and would affirm the judgment of the court of appeals. I agree with the trial court and the court of appeals that section 4.406 does not apply in this case because Martin's unauthorized signature did not appear on an item. In addition, I agree with the court of appeals that, for the sixty-day notice provision in the Deposit Agreement to be effective, Martin must have intentionally and knowingly agreed to the provision. I would hold that the sixty-day notice provision in the Deposit Agreement was inconspicuous, and therefore Martin did not knowingly and intentionally agree to it.

## I

In order for section 4.406(a) to apply, a customer must have failed to discover "*his unauthorized signature*" on an item. *See* TEX. BUS. & COM.CODE § 4.406.[1] Here, Martin never signed any document related to the transactions at issue. Similarly, Blair did not sign any of the journal vouchers related to the transactions. The Court creates the fiction that the tellers' initials on the journal vouchers constitute Martin's unauthorized signature, and therefore section 4.406 is triggered. The Court first hypothesizes that if Martin, and not Blair, had ordered the transfers, the tellers would have been acting as his agents in initialing the vouchers, and therefore their initials could be treated as Martin's signature. 29 S.W.3d at 93. The Court then summarily concludes that section 4.406's requirement that Martin's unauthorized signature appear on the item is satisfied because "the tellers signed the journal vouchers and effected the transfers without any authority from Martin, the account owner[, ... and] thus the signatures were unauthorized." 29 S.W.3d at 93. I disagree with both propositions.

---

**69.** *Id.* at cmt.

**1.** Section 4.406 was amended effective January 1, 1996. *See* Act of May 28, 1995, 74th Leg., R.S., ch. 921, § 4, sec. 4.406, 1995 Tex. Gen. Laws 4582, 4639–41. Other sections of the Business and Commerce Code were also amended effective January 1, 1996. In this opinion, all citations to the Texas Business and Commerce Code are to the version in effect in 1995.

The Court reasons that the tellers signed the vouchers as agents for Martin to authorize the transfers. As it concerns the phone transactions, the Court's argument is plausible because an account holder could not physically sign the document. But even when Blair ordered the transfers in person, the tellers initialed the vouchers themselves and did not ask Blair to sign the vouchers. Thus, it is clear that the tellers initialed the journal vouchers only in their capacities as credit union employees to create a record of the transaction, and not as agents for the account holder to authorize the transaction.[2]

Next, the Court treats the tellers' initials, made at Blair's direction, as Martin's unauthorized signature. But even if the tellers were acting as agents in initialing the journal vouchers, Blair—not Martin—ordered the transfers. Thus, the tellers would be acting as Blair's agents, and their initials could at most be treated as Blair's signature—not Martin's. By treating the tellers' initials as Martin's unauthorized signature, the Court effectively rewrites the statute to require the account holder to discover *any* unauthorized transaction, rather than only "his unauthorized signature."

Perhaps because it is enamored with the policy of placing "the burden on those best able to detect unauthorized transactions so that further unauthorized transactions can be prevented," *id.* at 94, the Court ignores the express requirement of section 4.406 that an account holder fail to discover and report *his unauthorized signature.* The Court states that, "here, the Credit Union sent the journal vouchers to Martin, and those vouchers contained enough information to inform him of Blair's unauthorized transactions." *Id.* at 94. But regardless of how much information the credit union provided to Martin concerning Blair's oral transactions, Martin's unauthorized signature was not involved, and therefore section 4.406 does not apply.

The only "unauthorized signature" in this case is Blair's forgery of Martin's signature on the account change card. An account holder incurs a duty under section 4.406 only when his unauthorized signature appears on an *item. See* Tex. Bus. & Com. Code § 4.406. An "item" is "any instrument for the payment of money even though it is not negotiable but does not include money." Tex. Bus. & Com.Code § 4.104(a)(7). An account change card is a document ordering the bank to change the properties of an account, not a document ordering the bank to pay money. Thus, although Martin's unauthorized signature appears on the account change card, the card is not an "item," and the card was never made known to Martin. Therefore, Martin did not incur a duty under section 4.406 to discover and report that forgery, and section 4.406 does not provide the credit union a defense for its negligence in transferring the funds.

In its opinion, the Court recognizes that one purpose of the Uniform Commercial Code is " 'to make uniform the law among the various jurisdictions.' " 29 S.W.3d at 93 (quoting Tex. Bus. & Com.Code § 1.102(b)(3)). The Court then asserts that its conclusion "is consistent with decisions from a variety of other jurisdictions which have read 'item' broadly, holding that deposit slips, savings account withdrawal orders, and even handwritten notes asking for cashiers' checks are items." 29 S.W.3d at 92, 93 (footnotes omitted). But none of the cases cited by the Court support that proposition. In all the cases the Court cites, the drawer, not the bank teller, filled out the item and then presented the item to the bank for payment of money. *See Boutros v. Riggs Nat'l Bank, D.C.,* 655 F.2d 1257, 1259 (D.C.Cir.1981); *Coleman v. Brotherhood State Bank,* 3 Kan.App.2d 162, 592 P.2d 103, 111–12

---

**2.** For the same reasons, the journal vouchers are probably merely receipts of the transactions and therefore do not constitute "items."

*See Mellon Bank, N.A. v. Securities Settlement Corp.,* 710 F.Supp. 991, 992–93 (D.N.J.1989).

(1979); *Shaw v. Union Bank & Trust Co.,* 640 P.2d 953, 954 (Okla.1981); *Burnette v. First Citizens Bank & Trust Co.,* 48 N.C.App. 585, 269 S.E.2d 317, 318 (1980). In fact, three of the four cases cited by the Court expressly note that the items were *signed by the drawer.* *See Boutros,* 655 F.2d at 1259 ("Besahi concededly made the withdrawals by presenting to the bank withdrawal slips on which he had signed Boutros' name."); *Coleman,* 592 P.2d at 112 ("The signature of the drawer was required on the savings account withdrawal order before money would be paid from the account by the bank."); *Burnette,* 269 S.E.2d at 318 ("In each instance, she forged plaintiff's signature on the withdrawal slip. . . ."). Moreover, each of these cases involves not only the signature of the drawer—as opposed to that of the bank teller—but each case also *deals with what purports to be the signature of the account holder*—"his unauthorized signature." *See Boutros,* 655 F.2d at 1259; *Coleman,* 592 P.2d at 111–12; *Burnette,* 269 S.E.2d at 318. Thus, like checks, these items acted as written directions from the drawer to the financial institution to distribute money, and were more than mere receipts of the transactions initialed by a bank teller. Thus, the cases the Court cites are significantly different from cases involving journal vouchers.

Contrary to the Court's assertion, courts considering funds transfers have consistently held that Chapter 4 does not apply. For example, in *Walker v. Texas Commerce Bank, N.A.,* a federal district court determined that, under Texas law, Chapter 4 does not govern wire transfers made by telephone:

> Although [the account holder] maintained an account with [the bank], and must be considered a customer of [the bank] within the meaning of [Article 4 of] the U.C.C., for the purposes of this

case, this Court shall assume . . . that Article 4 is inapplicable, and will instead apply common law principles.[3] Perhaps, the language of Article 4 could be stretched to encompass wire transfers, but such application was not within the contemplation of the draftsmen. Article 4 does not govern the transaction at issue because it does not specifically address the problems involved.

635 F.Supp. 678, 681 (S.D.Tex.1986). Many courts have since cited *Walker* for the proposition that Article 4 does not apply to funds transfers. *See Mellon Bank, N.A. v. Securities Settlement Corp.,* 710 F.Supp. 991, 993 (D.N.J.1989); *Security Pac. Int'l Bank v. National Bank,* 772 F.Supp. 874, 877 (W.D.Pa.1991); *Sinclair Oil Corp. v. Sylvan State Bank,* 254 Kan. 836, 869 P.2d 675, 680 (1994); *Department of Retirement Sys. v. Kralman,* 73 Wash. App. 25, 867 P.2d 643, 647 (1994). Thus, subjecting funds transfers to section 4.406 does not comport with other jurisdictions and therefore thwarts one of the main purposes of the Uniform Commercial Code. Rather than making Texas jurisprudence consistent with other jurisdictions, the Court embarks on a path inconsistent with other jurisdictions.

## II

Next, the Court holds that "[b]ecause section 4.406 establishes duties and not rights, the court of appeals' analysis of whether the Deposit Agreement adequately identified the right it purported to waive is also misplaced." 29 S.W.3d at 95. Under the notice provision in the Deposit Agreement, the account holder "waive[s]" his right to bring a cause of action against the credit union and "agree[s] that [the credit union] will not be liable" unless the account holder provides the credit union notice of "any objection" within sixty days.[4] The Court reasons that because

---

**3.** The Legislature adopted Article 4A to deal with funds transfers in 1993. Before Article 4A's adoption, courts often looked to the common law to decide cases involving funds

transfers after determining that Article 4 did not apply.

**4.** The Deposit Agreement provides:

section 4.406 places a duty on the account holder to discover and report his unauthorized signature on an item within one year, the notice provision in the Deposit Agreement merely modifies the account holder's duty under 4.406 by requiring the account holder to discover and report unauthorized signatures within sixty days rather than one year. Because section 4.406 does not apply—and Martin did not have a duty to discover and report Blair's unauthorized transfers—I disagree with the Court's treatment of the notice provision as merely modifying a duty.

Instead, the notice provision should be viewed as a waiver of rights. The Court acknowledges that "a bank is liable to its customer if it charges the customer's account for an item that is not properly payable from that account" and that "[a]n item with an unauthorized signature is not properly payable." 29 S.W.3d at 91 (citing TEX. BUS. & COM.CODE § 4.401(a)). As such, Martin is vested with statutory rights of recovery against the credit union. But the Court fails to recognize that the Deposit Agreement places new and more stringent limitations on those rights to the extent it alters the standard established in section 4.401(a). Because the notice provision limits Martin's ability to hold the credit union liable for its negligence, I would treat the provision as a waiver of rights.

## III

Because the notice provision limits Martin's statutory right to bring suit under the

Texas Business and Commerce Code, the provision is enforceable only if Martin knowingly, voluntarily, and intentionally agreed to that provision. *See Rolison v. Puckett,* 145 Tex. 366, 198 S.W.2d 74, 78 (1946); *Estes v. Wilson,* 682 S.W.2d 711, 714 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.); *Andrews v. Powell,* 242 S.W.2d 656, 661 (Tex.Civ.App.—Texarkana 1951, no writ); *The Praetorians v. Strickland,* 66 S.W.2d 686, 689 (Tex. Comm'n App.1933, judgm't adopted). The credit union did not mail a copy of the Deposit Agreement to Martin. At most, it notified him that a copy could be picked up at any of its branches, and that he could call the credit union to request a copy. Accordingly, because Martin was not aware of the change and the credit union never even gave the text of that change to him, I would hold as a matter of law that Martin did not knowingly, voluntarily, and intentionally agree to the notice provision, and did not waive his right to bring suit by failing to notify the credit union of the unauthorized transactions.

The Court notes that (1) in May 1994, the Credit Union adopted the Deposit Agreement containing the sixty-day notice provision, and so notified all its members; (2) the Credit Union made the new agreement available to Martin; and (3) Martin continued to maintain his account at the Credit Union. 29 S.W.3d at 95, 96. The Court concludes that "[t]hese actions are sufficient to demonstrate that the parties agreed to be bound by the terms of the Deposit Agreement." *Id.* at 96. The Court, however, fails to cite any cases

You are responsible for promptly examining each account statement. Any objection that you may have respecting any item shown on a statement will be waived unless made in writing to us, and received on or before the sixtieth (60 th) day following the date the statement is mailed, subject to applicable law. You agree that we will not be liable for any forged or altered item drawn on or deposited to your account if you fail to notify us within that sixty day period, nor will we be liable for any forged or altered item if the forgery or alteration is not readily ascertainable upon inspection. Unless

we adopt alternative procedures from time to time, checks drawn on your account will not be returned to you and copies of checks will be made available to you. That notwithstanding, you agree that your duty to examine statements promptly, and your obligation to notify us in the event of any error is not waived or diminished in any respect by our retention of checks drawn on your account. You agree that checks are deemed to be "made available" to you by your receipt of your statement and your ability to request copies of those checks.

supporting that proposition. Also, the Court fails to clarify at what point this "agreement" was formed. Were the new provisions effective immediately upon adoption by the Credit Union? Did Martin have a grace period in which he could go to the Credit Union to read the provisions? Because of these practical problems with the Court's unsupported conclusion, I would require the Credit Union to at least give its members a copy of the new agreement before holding that an agreement had been formed.

In sum, I would hold that section 4.406 does not apply and the notice provision in the Deposit Agreement is unenforceable because Martin did not knowingly, voluntarily, and intentionally agree to it. Accordingly, I dissent and would affirm the court of appeals' judgment.